**MAXIMA CORPORATION, Appellant,**

v.

**The UNITED STATES, Appellee.**

No. 86–1292.

United States Court of Appeals, Federal Circuit.

May 24, 1988.

Joe R. Reeder, Patton, Boggs & Blow, Washington, D.C., argued for appellant. With him on the brief were Richard M. Stolbach and Dean M. Dilley.

Thomas W. Petersen, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With him on the brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, and Stephen J. McHale. Also on the brief were Francis S. Blake, Gen. Counsel, Thomas A. Darner, Asst. Gen. Counsel, Richard D. Feldman and Anthony G. Beyer, E.P.A., of counsel.

Before SMITH, NIES and NEWMAN, Circuit Judges.

PAULINE NEWMAN, Circuit Judge.

Maxima Corporation ("Maxima") appeals the decision of the Board of Contract Appeals of the Department of the Interior (the "Board") pertaining to Contract No. 68–01–6466 between Maxima and the Environmental Protection Agency (the "Agency").[1] On cross motions for summary judgment the Board held that the Agency had properly invoked constructive termination for convenience, a year after completion of performance of the contract and final payment, and ordered Maxima to refund certain payment that had been made to it in accordance with the contract. We reverse.

*Background*

Maxima, through the Small Business Administration, entered into this contract to provide typing, photocopying, editing, and related services to the Agency. The contract set annual "Production Requirements ... Guaranteed Minimum", specifying an

---

1. *Maxima Corp. v. United States,* IBCA No. 1828, 86–2 BCA ¶ 18,888 (April 1, 1986).

annual minimum number of hours and pages for various categories of service. Maxima agreed to perform a minimum amount of work, as requested, up to a stated maximum, and the Agency agreed to pay Maxima the annual "Guaranteed Minimum" sum of $420,534 [2] (plus an equipment sum not at issue). Maxima was required to present monthly reports of the work performed. The contract term was from October 1, 1981 to September 30, 1982, with two one-year options to renew by the Agency.

Before entry into the contract Maxima had proposed a different arrangement, whereby the Agency would compensate Maxima on a cost plus fixed fee formula that did not include a minimum obligation on either side. The Agency rejected Maxima's proposal, and insisted on the Agency's terms whereby Maxima would stand ready to perform at the guaranteed minimum level. In consideration of the Agency's increase in its guaranteed minimum payment, Maxima substantially reduced its hourly and page charges from those in the original proposal.[3]

Throughout the term of the contract the services ordered by the Agency fell short of the rate represented by the guaranteed annual minimum. The Board found that "[i]n several of the reports, Maxima noted a concern that the services were being underutilized on the contract." *Maxima,* 86–2 BCA at 95,285. It is undisputed that the matter was raised by Maxima and that the government declined to change the contract terms. The Agency acknowledged in its termination decision that "[n]o action was taken by EPA in response to Maxima's request for contract adjustment until the last month of the contract."

2. The contract shows the following on its first page, entitled "Award/Contract" and bearing the signatures of both parties:

| | |
|---|---|
| Production Requirements Year 1— Guaranteed Minimum | 419,009.00 |
| Equipment Charges—Year 1 | 79,689.00 |
| Travel Charges—Year 1—Guaranteed Minimum | 1,525.00 |
| Total Guaranteed Minimum | 500,223.00 |

The "Quantity" and "Unit Price" columns are not otherwise filled, and the contract is described as "Fixed Price—Indefinite Quantity".

Nearing completion of the contract year and in connection with negotiations for future arrangements, the parties agreed that Maxima would provide to the Agency an additional (thirteenth) month of services "without additional consideration" beyond the Total Guaranteed Minimum for the twelve months then ending, along with entry into a new contract for the subsequent year, now on a cost plus fixed fee formula. The unused contract minimum was billed to the Agency on October 31, 1982, upon completion of the thirteenth month's work, and was paid in December 1982.

The contract contained the "Termination for convenience of the government" clause that is usual in government contracts. The Agency did not invoke this clause during the term of the contract, nor for a year thereafter. On November 16, 1983 the Agency advised Maxima that the contract was constructively terminated for convenience on October 31, 1982, based on the Agency's failure to have ordered the contractual minimum amount of services during the contract term. On appeal to the Board, the Agency was held liable only for the services actually ordered and received, at the rate set in the contract for the various services. Maxima was ordered to refund the balance of the contractual minimum that the Agency had paid the previous December.

### The Issue

The issue on appeal, as it was before the Board, is "the central question of law, the question of whether the termination clause of the contract can be asserted retroactively where guaranteed minimum quantities have not been ordered." *Maxima,* 86–2 BCA at 95,287. Our review of this question of law is governed by 41 U.S.C. § 609(b).

3. Maxima was required to maintain work stations both off site and on site. The contract stated the guaranteed minimum and the maximum obligation as agreed for each activity; the maximum was twice the minimum (the contract said that Maxima exceeded this maximum at its risk). For example, following are representative two of the eleven specific services listed on contract "Attachment 1":

### Constructive Termination for Convenience

In its myriad dealings in furtherance of the business of government, the United States enters into contractual obligations by constitutional authority, and through the laws of contract and the rules of commerce the government benefits from access to and interaction with the vast private sector of the nation. "When the United States, with constitutional authority, makes contracts, it has rights and incurs responsibilities similar to those of individuals who are parties to such instruments." *Perry v. United States*, 294 U.S. 330, 352, 55 S.Ct. 432, 435, 79 L.Ed. 912 (1935). *See also Lynch v. United States*, 292 U.S. 571, 580, 54 S.Ct. 840, 844, 78 L.Ed. 1434 (1934) ("Punctilious fulfillment of contractual obligations is essential to the maintenance of the credit of public as well as private debtors"); *Alvin, Ltd. v. United States Postal Service*, 816 F.2d 1562, 1564 (Fed.Cir.1987) ("The government enters into contracts as does a private person, and its contracts are governed by the common law").

One of the few exceptions to the common law requisite mutuality of contract is that here at issue. The "termination for convenience" concept, which serves only the government, arose from the unpredictable nature of governmental wartime procurement. The right to terminate a contract when there has been no fault or breach by the non-governmental party, that is, for the "convenience" of the government, appeared as a legal concept after the Civil War, to facilitate putting a speedy end to war production. See the historical review in *Torncello v. United States*, 681 F.2d 756, 764–66, 231 Ct.Cl. 20 (1982).

After World War II termination for convenience came to be applied to peacetime non-military procurement, in order to achieve the same fundamental purpose: to reduce governmental liability for breach of contract, by allocating to the contractor a share of the risk of unexpected change in circumstances. *Id.* at 765–66. Thus the contractor, instead of receiving compensation for governmental breach of contract based on classical measures of damages, is limited to recovery of "costs incurred, profit on work done and the costs of preparing the termination settlement proposal. Recovery of anticipated profit is precluded." R. Nash & J. Cibinic, Federal Procurement Law 1104 (3d ed.1980).

The extensive jurisprudence generated by this concept illustrates its fairly uniform modern application. The courts have held that a governmental breach of contract may be construed as a termination for the convenience of the government when changed circumstances justify the reallocation of risk to the contractor. When such circumstances exist, the contract may be terminated by the government without incurring the consequences of breach:

**3.** footnote cont'd.

Yearly Production Requirements in Pages Completed
(By Type of Work Per Page)—Off Site—Year 1

| Item Description | Guaranteed Minimum No. of Pages | Maximum No. of Pages | Cost for 48 hr. Turnaround per Page | Cost for 168 hr. Turnaround Per Page |
|---|---|---|---|---|
| Typing–Straight Text–NBI Diskettes | 22150 | 44300 | 5.06 | 4.40 |
| Typing–Straight Text & Equations– Mag Cards | 788 | 1575 | 5.46 | 4.75 |

Attachment 2 describes the on-site requirements in similar detail. Attachments 3–4 list editing, proofreading, indexing, and graphical artwork services. The total guaranteed minimum dollars (see footnote 2 supra) was calculated as the *minimum* total services at the 168–hour turnaround rate, although the contract required

Maxima to provide not only the minimum but up to the maximum number of pages and hours, and also to provide 48–hour turnaround when requested, both on-site and off-site. For this capability the agency *guaranteed* the minimum amount of payment stated in the contract.

The rule we have followed is that, where the contract embodies a convenience-termination provision as this one would, a Government directive to end performance of the work will not be considered a breach but rather a convenience termination—if it could lawfully come under that clause—even though the contracting officer wrongly calls it a cancellation, mistakenly deems the contract illegal, or erroneously thinks that he can terminate the work on some other ground.

*G.C. Casebolt Co. v. United States*, 421 F.2d 710, 712, 190 Ct.Cl. 783 (1970). As illustrated in *Casebolt*, the concept of constructive termination for convenience enables the government's actual breach of contract to be retroactively justified. Such justification may be appropriate

in situations in which the government has stopped or curtailed a contractor's performance for reasons that turn out to be questionable or invalid. Constructively, the clause can justify the government's actions, avoid breach and limit liability.

*Torncello*, 681 F.2d at 759 (citing *College Point Boat Corp. v. United States*, 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925)).

Constructive termination for convenience is a judge-made doctrine, and remains unrecognized in the procurement regulations that authorize "actual" termination for convenience. Constructive termination is applied when the basis upon which a contract was actually terminated is legally inadequate to justify the action taken. The doctrine traces its origins to *College Point*, wherein the Supreme Court held:

A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact. He may, likewise, justify an asserted termination, rescission, or repudiation, of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later.

267 U.S. at 15–16, 45 S.Ct. at 200–201 (footnotes omitted).

*College Point* thus limited the government's liability for "termination, rescission, or repudiation" of a contract during its term. Under the facts in *College Point*, as in ensuing cases, there was an actual stoppage, and therefore there had not been full performance by the contractor. In principle it was the justification that was retroactive, not the termination.

The jurisprudence makes clear that termination for convenience, whether actual or constructive, is not of unlimited availability to the government, that it is not an open license to dishonor contractual obligations. *See, e.g., Torncello*, 681 F.2d at 770, 772 (refusing to authorize termination for convenience that would "vitiate the consideration normally furnished" or allow the government to "dishonor, with impunity, its contractual obligations"); *Kalvar Corp. v. United States*, 543 F.2d 1298, 1304–05, 211 Ct.Cl. 192 (1976), *cert. denied*, 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977) (authorizing constructive termination for convenience to moot claim for breach of the contract during its term, absent bad faith or clear abuse of discretion); *Inland Container, Inc. v. United States*, 512 F.2d 1073, 1082, 206 Ct.Cl. 478 (1975) (contract actually breached by government during its term; damages measured by convenience clause); *Nolan Brothers, Inc. v. United States*, 405 F.2d 1250, 1254, 186 Ct.Cl. 602 (1969) (government terminated contract after it was partly performed; convenience clause may be invoked to limit damages). The Claims Court has summarized the law in *Municipal Leasing Corp. v. United States*, 7 Cl.Ct. 43, 47 (1984):

The termination for convenience clause can appropriately be invoked only in the event of some kind of change from the circumstances of the bargain or in the expectations of the parties.... The termination for convenience clause will not act as a constructive shield to protect defendant from the consequences of its decision to follow an option considered but rejected before contracting with plaintiff.

No judicial authority has condoned use of the convenience clause to create a breach

retroactively, where there was none, in order to change the government's obligations under a completed contract.

*Analysis*

A

■ Maxima offers several arguments in support of its position that the contract is not subject to retroactive termination under the convenience clause. Maxima emphasizes that it was required to and did maintain the capability of providing the minimum services set in the contract, thereby providing the full contractual consideration. Maxima reminds us that the Agency had insisted on this form of contract, and that on this basis Maxima had reduced its unit prices. Maxima points to its offer and the Agency's acceptance of a thirteenth month of services within the minimum payment established for the twelve-month contract, and the Agency's payment of the contract amount. Maxima argues that a year after completion of performance, and final payment, is too late for the Agency to impose, retrospectively, new non-negotiable terms on Maxima.

The government argues that it is never required to pay for services it does not receive, whatever the circumstances. The government states that because there was no fraud, it is not restrained by the *Torncello* proscription against "dishonoring, with impunity, its obligations". The government states that it erred in failing to terminate the contract during its term, in paying the contract minimum, and in accepting the thirteenth month of services, and must be allowed to correct these errors. Finally, the government argues that retroactive constructive termination must be permitted or the termination for convenience clause in the contract would be meaningless.

The Board, holding for the government, relied on *College Point*, which it states has "striking similarities to the instant case". We discern scant similarity. In *College Point*, World War I ended less than three weeks after the contract with the Navy was signed; the Navy "suggested" that the contractor stop work, which it did; and the contractor then sought to recover its full prospective profits. The Supreme Court observed that the Navy did not appear to know at the time of its "suggestion" that it had an absolute right of cancellation based on a 1917 statute, and held that the government could retroactively rely on this statutory right. The Court held that there had been an anticipatory breach by the government, and the only question was the measure of damages:

As [the government's] efforts to procure consent to cancel proved futile, stopping the work was an anticipatory breach. The question remains whether the measure of damages recoverable for this breach is the same as it would have been if the Government had not possessed the right of cancellation.

267 U.S. at 15, 45 S.Ct. at 200. *College Point* thus held that an anticipatory breach may be later (constructively) justified; but it does not authorize retroactive *creation* of a breach where there was none, and where the contract was fully performed on both sides.

The Board also relied on *John Reiner & Co. v. United States*, 325 F.2d 438, 163 Ct.Cl. 381 (1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964), as support for its position that the government can retrospectively change its payment obligation to Maxima, even though no action had been taken to terminate the contract during its term. In *John Reiner* the contract was cancelled by the government during its term, in fact soon after its inception, on the ground that the contract was improperly awarded. The Court of Claims held that although the actual cancellation was based on an invalid ground, there also existed a valid ground. Because of this valid ground the contract was held properly subject to the liability limitations of convenience termination. *Id.* at 443.

*John Reiner* is part of the established jurisprudence illustrating proper use of constructive termination for convenience when a contract would otherwise be deemed breached or prematurely terminated. In addition, the boards of contract

appeals have treated constructive termination for convenience in a variety of situations, with varying, fact-dependent conclusions. The closest case on its facts is *North Chicago Disposal Co.,* ASBCA No. 25535, 82–1 BCA ¶ 15,488 (1981). The Navy had contracted for garbage disposal services, wherein the contractor was obligated to handle all the Navy's garbage for fixed monthly payments. The contractor appeared to remove the garbage, but very little was placed for removal. After the contract ended the Navy sought to recoup the sums paid on the theory of constructive termination for convenience. The board held that the Navy could not do so when the contractor had fully performed its obligations. In *Charles Bainbridge, Inc.,* ASBCA No. 19949, 75–2 BCA (CCH) ¶ 11,414, 54,337 (1975), the government contracted to order a minimum (not designated as "guaranteed") of $21,518 of house painting services. The government ordered less, and refused to pay the minimum sum. The board held that either the termination for convenience clause or damages for breach by the government could apply. In *Bainbridge,* there was no issue of standby capability to perform, no unreasonable delay by the government, and no payment of the minimum contractual amount. We do not share with the dissent the weight that it places on this holding by an administrative board.

These cases are in tune with the purpose of reducing the government's risk based on unexpected events that occur during the term of a contract, by shifting some of this risk to the contractor.

### B

■ The government argues that a ruling in favor of Maxima would render the termination for convenience clause superfluous, and thus would violate regulations which require inclusion of the clause in the

contract. However, the issue is not whether the government could have invoked the termination for convenience clause during the term of the contract, for it did not do so. The purpose of the clause is not to authorize unilateral renegotiation of a contract after it has been fully performed.[4]

The government in its brief acknowledges the principle that "changed expectations" is a prerequisite to termination of a contract for convenience, under the authority of *College Point* and Court of Claims precedent. The government argues that the Agency's failure to order the minimum quantities from Maxima is proof of changed expectations. However, this governmental action taken a year after completion of performance of the contract by both parties is not a cancellation based on changed expectations. It is, at best, a claim for retroactive adjustment in the contract price.

For the government to state a claim for retroactive adjustment following completion of performance, if the contract contains no clause setting an express time limit, the claim must be brought within a reasonable time. *See American Western Corp. v. U.S.,* 730 F.2d 1486, 1489 (Fed.Cir. 1984) (six weeks after final payment is not unreasonable for a claim based on reduction in the cost of raw materials during the contract term, when the contract provided for adjustment in the contract price upon such reduction and the contractor knew the cost had declined). The court in *American Western* relied on *Roberts v. U.S.,* 357 F.2d 938, 946–47, 174 Ct.Cl. 940 (1966), wherein the court stated:

> when the Government is acting in its proprietary capacity, it may be estopped by an act of waiver in the same manner as a private contractor. Such a result is justified by the plain language of the contract and accords with the principles of fair dealing.

---

**4.** The Board, recognizing the consequences of its holding, warned that the "effect of the case law is to void any guarantees concerning minimum quantities promised by the Government by the operation of the Termination rights."

*Maxima,* 86–2 BCA at 95,289 n. 2. Such a warning can not legitimize the Board's new theory of retroactive termination after full performance.

The *Roberts* court favorably cited *Appeal of Randall Construction Co.*, WDBCA 675, 2 CCF 1117 (1944), which held unreasonable a delay of more than one year after completion of work before the government attempted to reduce the contract price.

Here Maxima knew that the government was not meeting its minimum rate of orders but, unlike the contractor in *American Western*, Maxima brought the situation to the attention of the Agency during the contract term, and the government required Maxima to comply with the contract as written.[5] This circumstance weighs on the side of Maxima's argument that the government's delay in raising any objection until a year after complete performance on both sides is unreasonable.

In denying Maxima the opportunity to negotiate the terms of the imposed termination for convenience, the Board cited the one-year contract limitation whereby "Clause 12 of the contract provides that the contractor's termination claim shall be submitted within 1 year after the effective date of termination, and thereafter for the unilateral determination of the amount owing the contractor by the contracting officer." *Maxima*, 86–2 BCA at 95,289. We assume the Board did not intend the curious result that Maxima's claim was barred before it arose, which in any event is mooted by our decision. However, we do view this contract clause as supporting the conclusion that one year after completion of performance is in this case an unreasonable time to change the terms of performance.

### C

■ The government dismisses its actions at the time the contract term expired, particularly the inclusion of the thirteenth month of services as part of the twelve-month minimum payment, as unauthorized and therefore not binding on it. The government's argument that its contracting officer erred because he did not know of the termination for convenience clause, a clause occupying four pages of the contract, does not relieve the government of its contractual obligations. Both parties to a contract are charged with knowledge of its terms. Neither the contractor nor the government can avoid its legal responsibilities by asserting ignorance. Further, the payment of the contractual minimum was not an "error" that was "discovered", as the dissent describes it; it was the agreed payment timely made.

What the government asserts as legal error is its compliance with the terms of the contract. We discern no legal error in this behavior. Indeed the government also required Maxima to comply with the contract. The need for mutual fair dealing is no less required in contracts to which the government is a party, than in any other commercial arrangement. "It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their government." *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229, 82 S.Ct. 289, 301, 7 L.Ed.2d 240 (1961) (Black, J., dissenting). *See also Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir.1970) ("To say to these appellants, 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government"), *quoted in Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 61 n.

---

5. Maxima wrote the agency in September 1982, during negotiations of the contract for the following year, for which the agency had an option at the same terms (and even larger volumes). Maxima stated that the lower volume of services ordered during the first year "resulted in significant operating losses" and "a potentially serious cash flow problem", and that "[a]lthough the contract guarantees provided some protection against losses at the end of each contract term, there was no contract provision for some sort of progress payments in accordance with the guaranteed minimum."

The agency had ignored Maxima's several earlier complaints and had held Maxima to the contract terms, such that the unused minimum accumulated unpaid until the end of October 1982 (the thirteenth month) when Maxima billed the entire annual minimum plus the October services, a total of $267,872.50. This was not, as the dissent states, payment for one month's services. (Nor do we endorse the dissent's other characterizations of the facts, the arguments, the authorities, and the holdings of our opinion.)

13, 104 S.Ct. 2218, 2224, n. 13, 81 L.Ed.2d 42 (1984).

The government argues that it is never barred from recovering monies erroneously paid, pressing (at oral argument) as "controlling precedent" *United States v. Wurts*, 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932 (1938). The reliance is curious. *Wurts* held that a two-year statute of limitations against recovery by the government of an erroneously paid income tax refund did not start until the erroneous payment was actually made. *Id.* at 418, 58 S.Ct. at 639. The issue in *Wurts* was not whether the payment was erroneous, but whether its recovery was time barred by statute; neither side had raised that issue.[6]

### D

█ The government further takes the position that there was no guaranteed minimum price in the contract, and thus that it can not be obliged to pay the contract minimum. However, without a guaranteed minimum obligation on both sides, this would be a contract of the sort that has long been recognized to fail for lack of consideration and mutuality. *See Willard, Sutherland & Co. v. United States*, 262 U.S. 489, 493, 43 S.Ct. 592, 594, 67 L.Ed. 1086 (1923):

> There is nothing in the writing which required the Government to take, or limited its demand, to any ascertainable quantity. It must be held that, for lack of consideration and mutuality, the contract was not enforceable.

The Court also observed that:

> While the contract at its inception wasnot enforceable, it became valid and binding to the extent that it was performed.

*Id.* at 494, 43 S.Ct. at 594.

At least since *Willard, Sutherland* the government has refrained from entering into such contracts. *See, e.g., Mason v.*

*United States*, 615 F.2d 1343, 1346 n. 5, 222 Ct.Cl. 436 (1980). "[A] Guaranteed Minimum Quantity clause [serves] to ensure mutuality of obligations, and to make the contract enforceable by both parties to it." *Id.* at 1350. The government, and the dissent, ignoring the minimum obligations as negotiated and agreed by both sides, is asking the court to make a valid contract invalid. This contravenes the fundamental obligation to interpret contracts so as to preserve their validity, not to destroy it. *Walsh v. Schlecht*, 429 U.S. 401, 408, 97 S.Ct. 679, 685, 50 L.Ed.2d 641 (1977); *Hobbs v. McLean*, 117 U.S. 567, 576, 6 S.Ct. 870, 874, 29 L.Ed. 940 (1886); S. Williston, A Treatise on the Law of Contracts § 620 (3d ed.1961).

The government recognized at oral argument, as indeed it must, that no decision has upheld retroactive application of a termination for convenience clause to a contract that had been fully performed in accordance with its terms. The asserted partial constructive termination for convenience was improper. The Board's judgment is reversed, with instructions to enter judgment in favor of Maxima.

REVERSED.

NIES, Circuit Judge, dissenting.

I dissent. In October, 1982, Maxima actually performed services priced at $32,236.85 under the subject contract for which Maxima submitted a voucher for payment of $267,872.50 for "services performed." The voucher was approved by the contracting officer, who mistakenly thought that the government was liable for that amount regardless of the quantity of services ordered, and payment followed routinely. The voucher and the payment were erroneous because, under the terms of the contract, Maxima was entitled to payment only for services actually ordered by the govern-

---

6. The dissent also urges, without supporting authority, that the government can always change its contracts, even, as here, well after final payment and expiration of the period in which the contractor could file a claim. The dissent accuses the majority of "largesse". The issue is not "largesse", but law; the integrity of commerce with the government. The decisions of the Supreme Court and the Court of Claims not only support, but require, a just application of retroactive termination for convenience. The converse, that the government can always change the bargain, even long after performance of that bargain and whatever the facts, is anathema not only to the rule of law but to the principles of a great commercial nation.

ment, performed by Maxima, and accepted by the government.[1] In an audit a year later, the erroneous payment was discovered and the agency asserted a claim against the contractor for the amount of the overpayment less an allowance for the contractor's termination for convenience costs. The contracting officer's decision allowed the government's claim and Maxima appealed that decision to the board.

The board upheld the government's *entitlement* on its claim for return of the erroneous payment. On the issue of entitlement the board held:

> The payment of the invoice was unauthorized and therefore mistaken. Such funds paid under a mistake of law must be refunded. *DiSilvestro v. United States*, 405 F.2d 150 (2d Cir.1968), *cert. denied*, [3]96 U.S. 964 (1969).

*Maxima Corp.*, IBCA No. 1828, 86–2 BCA (CCH) ¶ 18,888, 95,289 (Apr. 1, 1986). On the issue of *quantum* of the government's recovery, the board held that the government had correctly calculated the amount of the overpayment for unperformed services. That brought the board to the question of a possible setoff by Maxima. Although Maxima had filed no claim against the government, the board saw "no useful purpose in remanding this long-standing dispute." *Id.* Therefore, it reviewed and approved the amount of the setoff which the government had voluntarily deducted based on an estimate of Maxima's termination for convenience costs. The board

ruled that the termination for convenience clause allowed the government "to escape liability for *breach of contract damages* ... even when asserted retroactively," citing *College Point Boat Corp. v. United States*, 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925) (emphasis added). *Maxima Corp.* at 95,287.

The majority holds that in this case the government is not entitled to terminate for convenience retroactively. It does not, however, remand so that Maxima might prove the amount of its breach of contract damages, as in *Torncello v. United States*, 681 F.2d 756, 231 Ct.Cl. 20 (1982). Rather, the majority holds that Maxima "fully performed" an indefinite quantities contract by "maintain[ing] the capability of providing the minimum services set in the contract," and, therefore, Maxima cannot be ordered to refund the amount of the payment that, per the majority, was made "in accordance with the contract."[2]

The majority makes the following rulings with respect to a "standard indefinite quantities contract," that is, one containing a promise by the government to purchase a guaranteed minimum quantity of goods or services and incorporating a termination for convenience clause:

1. A contractor fully performs a standard indefinite quantities contract by maintaining the "capability" for delivery of the guaranteed minimum quantity specified in the contract.[3]

---

1. Article XI provides:
   CONSIDERATION AND PAYMENT
   A. The Contractor shall submit an invoice for payment with each completed Delivery Order. The Contractor's invoice will be approved for payment by the Government Project Officer upon *completion* and *acceptance* of the work required by the Delivery Order(s) issued under the article entitled "Delivery Orders".
   B. The Government *will pay* the Contractor for the *performance* of the work under this contract at the appropriate fixed rates stated in Attachments 1–12, whichever are in effect at the time of performance....
   (Emphasis added.)
   The General Provisions include the following PAYMENTS clause:
   > The Contractor shall be paid, upon submission of *proper* invoices or vouchers, the price stipulated herein *for services rendered* in ac-

   cordance with this contract or for supplies delivered and accepted, less deductions, if any, as herein provided. Unless, otherwise specified, payment will be for *any portion of services rendered* or supplies accepted for which a price is separately stated in the contract.
   (Emphasis added).

2. The majority's opinion at 1550, could be read as indicating a finding by the board that payment was in accordance with the contract terms. The board did not so hold. *See* attached Appendix.

3. The majority's conclusion that the indefinite quantities contract in this case equates with the contract in *North Chicago Disposal Co.*, ASBCA No. 25535, 82–1 BCA (CCH) ¶ 15,488 (Nov. 23, 1981), for running a garbage route is ludicrous. The contractor in *North Chicago* had fully per-

2. The government does not breach by failing to order the minimum required quantity and, therefore, cannot invoke termination for convenience retroactively to justify a "breach."

3. If the government does not exercise its right to terminate for convenience prior to the end of the contract term, the government become obligated to pay the price for the guaranteed minimum quantity.

4. If the government were not made to pay the full price for the guaranteed minimum quantity, the contract would be void for lack of consideration.[4]

Since the majority announces these new tenets in a "precedential" decision dealing with a standard indefinite quantities contract, the new tenets cannot be treated as simply an *ad hoc* decision to achieve a "fair" result for a small contractor. The majority proclaims them as general principles applicable to standard indefinite quantities contracts.

I find each of the above holdings represents a bizarre twist of contract law and dissent from each of them.

Where a contractor is ready, willing, and able to perform, and is prevented from doing so by the government—in this case by the government's failure to order the minimum amount of services which it was obligated to order under the contract—obviously a contractor may not be terminated for the contractor's default. *See College Point*, 267 U.S. 12, 45 S.Ct. 199. However, it is basic contract law that a contractor is not entitled to the *full contract price* simply because he has not defaulted. Actual delivery of the full amount of goods or services is required for entitlement to the full contract price. In the absence of such full performance, an innocent, injured contractor is at most entitled to damages, which may include lost profits.[5] That

---

formed its contractual obligations because the contract required only that it pick up and haul off whatever amount of garbage the government left for collection. There was no specified minimum quantities of garbage in the contract. By no stretch of the imagination can the *North Chicago* case be termed "the closest case on its facts," as the majority refers to it.

A case directly on point is *Charles Bainbridge*, ASBCA No. 19949, 75–2 BCA (CCH) ¶ 11,414 (July 14, 1975). That case involved an indefinite quantities contract for painting services. The government promised to order a minimum quantity of services but, when the contract had expired, it had failed to do so. The contractor filed a claim for the contract price of the unperformed services. The board properly gave short shrift to that claim holding that, but for the presence of the termination for convenience clause in the contract, the contractor would have been entitled to, at most, damages for breach of contract by the government in failing to order the minimum quantity of services. However, the board upheld retroactive application of the termination for convenience clause to limit the contractor's recovery to the amounts allowable under that clause. That ruling is entirely in accordance with established law that, in the absence of fraud, a government breach may be converted retroactively into a termination for convenience. *See College Point*, 267 U.S. 12, 45 S.Ct. 199; *Torncello*, 681 F.2d 756; *Kalvar Corp. v. United States*, 543 F.2d 1298, 1301–03 (Ct.Cl.1976); *Colonial Metals Co. v. United States*, 494 F.2d 1355, 1361, 204 Ct.Cl.

320 (1974). *See* R. Nash & J. Cibinic, 2 *Federal Procurement Law* 1116 (3d ed. 1980).
In the present case, there is no evidence of bad faith by the government.

4. On this point the majority totally confuses the concepts of consideration and damages. To make an indefinite quantities contract enforceable, a buyer must promise to purchase from a seller a guaranteed minimum quantity of goods or services. *See Mason v. United States*, 615 F.2d 1343, 1346 n. 5, 222 Ct.Cl. 436 (1980). It is the *promise* to perform that provides the consideration, not the performance itself. Of course, if the buyer breaches that promise, the seller is entitled to damages. Under general contract principles the purpose of awarding damages is to compensate for harm done. The law accomplishes that purpose by placing the injured party only "in as good a position pecuniarily as he would have been by performance of the contract." *Miller v. Robertson*, 266 U.S. 243, 257, 45 S.Ct. 73, 78, 69 L.Ed. 265 (1924); 5 *Corbin on Contracts* § 1002 at 31 (1964); 11 *Williston on Contracts* § 1338 at 198 (3d ed. 1968). Thus, it must be recognized that the minimum quantity provision of an indefinite quantities contract serves two distinct roles. It establishes the necessary consideration for the contract and provides a means for measuring damages if the contract is breached.

5. Maxima is not entitled to be put in a better position by the recovery than if it had had to perform and bear the expense of full performance. *See Miller*, 266 U.S. at 260, 45 S.Ct. at 79.

truism applies as a general principle of contract law to government contracts. *See Torncello,* 681 F.2d 756. The majority suggests no basis for distinguishing a fixed-quantity/fixed-price contract, as in *College Point,* from the indefinite-quantity/fixed-price-per-item contract here, and there is none. Anomalously, it relies on the fact payment was made to decide the question of whether payment should have been made.

From its false conclusion that the contract was fully performed, the majority devotes most of its opinion to developing the premise that a *fully performed* contract cannot be retroactively terminated for convenience. Neither the board, nor the government, nor this dissent, raises the slightest question about the validity of that premise. The majority sets up a strawman which it successfully knocks down. The strawman does not support the majority's award of the contract price to Maxima. This dissent does not urge that the government "can always change its contracts, even, as here, well after final payment and expiration of the period in which the contractor could file a claim." This dissent maintains that Maxima was not entitled to the "final payment" under the *terms* of the contract. The majority points to no contract provision which authorized payment. Further, the majority does not explain why Maxima's time for filing "a claim" would have expired. The dissent does not believe it has.

Because, under all precedent, Maxima would ·be entitled at most to breach of contract damages (i.e., lost profits), not to the contract price, where the contractor did not perform the amount of services which is the *quid pro quo* for the payment it received, it is not surprising that Maxima did not advance the majority's novel theory that Maxima "fully performed" according to the terms of the original contract. Instead, Maxima constructed a convoluted defense that in exchange for the one-month extension and the follow-on contract, the government agreed to pay $267,872.50, re-

gardless of the amount of services the government ordered in October, 1982. It is this *modified* or *second* contract which Maxima asserts was fully performed and was the basis for its motion for summary judgment. Moreover, it is the *only* basis for Maxima's summary judgment motion.

The board found that there was no second contract. I agree for the reasons set forth in the board's opinion. Rather than restate those reasons, I rely on the board's opinion which is appended. The majority does not adopt Maxima's "second contract" argument. Maxima's argument is inconsistent with the majority's own theory that payment was correct under the original contract. It simply declares that the $267,-872.50 payment was not for the October extension even though that is Maxima's position. In my view, the majority's action in granting *summary judgment* against the government on a theory never advanced by Maxima, never ruled on by the board, and which raises numerous factual questions which the government has been given no opportunity to answer, violates principles of due process and departs from the role of an appellate court. *See Securities & Exch. Comm'n v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). Even the government, as representative of the taxpayers, is entitled to due process.

### Conclusion

Stripped of the confusion created by the majority, this case quite simply involved the question of whether the government made a mistaken payment on an erroneous invoice. The parties stipulated that the government did not order and Maxima did not perform the guaranteed minimum quantity of services under the original contract. On those stipulated facts, the contract was *not* fully performed so as to trigger an obligation to pay or a right to receive the price for the guaranteed minimum quantity of services under the original contract. Unless one accepts Maxima's

*See also Illinois Cent. R.R. Co. v. Crail,* 281 U.S. 57, 63, 50 S.Ct. 180, 181, 74 L.Ed. 699 (1930)

(remedies compensate only for injury suffered).

"second contract" theory, the government is entitled to recover, and the quantum of the government's claim is the amount paid for undelivered services. Termination for convenience is irrelevant to the government's *entitlement* to recover an erroneous payment or to the *quantum* of the *government's claim.* Termination for convenience relates to the wholly separate question of the amount of the contractor's claim against the government as a consequence of the government's breach in failing to order the minimum quantity of services. The contractor has, to date, presented no claim against the government.[6] The board felt compelled to advise on the quantum of the contractor's claim because of the length of time the matter had been pending. However, no contractor's claim was before the board. But even assuming the board was wrong in restricting the setoff deduction to termination for convenience costs, the government is entitled to partial summary judgment (i.e., on entitlement and quantum of the government's claim) and merely the board's ruling on the amount of Maxima's setoff should be vacated. Under no rational theory is Maxima entitled to the contract price of undelivered services. At most Maxima is entitled to a *remand* to give it the opportunity to prove its damages.[7] To deny the government's summary judgment motion to recover the payment it made for nonperformed services, as the majority does, is legally unsound; to grant Maxima's summary judgment motion on the majority's *sua sponte* theory of full performance of the original contract is unprincipled.

The majority's largesse with public funds appears to arise from misplaced sympathy for the contractor. One need not rewrite basic contract law in order to protect the contractor here.

The only issue is whether Maxima is not entitled to retain the amount paid on Maxima's invoice for undelivered services. Un-

der the terms of the contract, Maxima was entitled to the guaranteed minimum for actual performance of services, not for "standing by." The fact that the government paid the erroneous invoice does not change Maxima's nonperformance into performance. Thus, the board correctly granted summary judgment on the government's claim.

APPENDIX

Maxima Corp.

IBCA No. 1828.

April 1, 1986.

Contract No. 68–01–6466.

Opinion by Administrative Judge Lynch with Administrative Judge McGraw concurring.

This is the second opinion issued respecting these Cross Motions for Summary Judgment. In our decision dated September 10, 1985, *Maxima Corp.*, IBCA 1828, 85–3 BCA 18.381, 21 I.D. 263, we denied both motions as we found there were disputed questions of material fact requiring resolution. Thereafter, the parties filed with the Board a Parties' Joint Motion for Clarification asking guidance from the Board regarding the disputed facts to provide the basis for a stipulation. Subsequently, in a conference held on November 25, 1985, the parties agreed that the third condition in appellant's letter of September 27, 1982, limiting the services to be called for in the thirteenth month, was based upon appellant's concern that the Environmental Protection Agency (EPA) might exceed appellant's capacity to perform. The parties further agreed that they considered the case ripe for decision of the question of law presented.

Because this opinion is dispositive of the appeal, the factual presentation of the ap-

---

**6.** The contractor had, of course, no incentive or need to present a claim unless and until it had to pay back the erroneous overpayment.

**7.** Maxima is entitled to termination for convenience costs or to breach of contract damages. Further, if Maxima can show it underpriced its

services in reliance on the volume of orders it was guaranteed, it would be entitled to an equitable adjustment of the price of *delivered* services. *See* R. Nash & J. Cibinic, at 1116. Those issues are not before us.

peal presented in our earlier opinion is set forth in its entirety below.

On April 23, 1981, EPA issued a request for proposal for a fixed-price, indefinite quantity contract for typing, photocopying, editing, and related services. Maxima Corporation (Maxima) responded with a cost and technical proposal, and included advice that with the lack of quantity definition and the magnitude of fixed costs involved, serious consideration should be given to a contract on a cost reimbursement or labor hour/time and materials type agreement. EPA considered Maxima's prices to be excessive and Maxima advised that the firm could lower its proposed prices if EPA were to increase the minimum quantities. EPA did raise the minimum quantities to half the maximum quantities with the result that Maxima's revised proposal substantially decreased its original prices. The resulting contract was awarded to the Small Business Administration (SBA) by EPA under the 8(a) program for minority and disadvantaged small business firms. SBA subcontracted the entire contract to Maxima, effective October 1, 1981. The performance period was 1 year to September 30, 1982, with 2 additional option years at the election of the Government.

The contract contained the "Termination for Convenience" clause for supply and service contracts. The contract contained 12 attachment pages describing the work to be done with some items providing for a "Guaranteed Minimum No. of Pages" and a "Maximum No. of Pages," and other items providing for a "Guaranteed Minimum No. of Hours" and "Maximum No. of Hours." The face page of the contract contained the following:

Production Requirements Year 1—
Guaranteed Minimum....... $419,009.00
Equipment Charges Year 1... 79,689.00
Travel Charges Year 1—
Guaranteed Minimum....... 1,525.00
Total Guaranteed Minimum ... 500,223.00

The above figures were computed by multiplying the estimated minimum quantities for each type of service by the contract's fixed price for that service.

From the outset of the contract, the services required by Maxima by the issuance of delivery orders were significantly below the minimums expressed in the contract. In monthly progress reports, Maxima reported the amount of work for the period and the work to date on a cumulative basis as a percentage of the minimum quantities. In several of the reports, Maxima noted a concern that the services were being underutilized on the contract. In the waning months of the first year of performance, EPA determined that it did not want to exercise the option to renew the contract with minimum and maximum quantities, but would seek to replace the contract with a cost reimbursement type. Because of time constraints to process the new contract and desiring continuous service, EPA wanted an extension of 1 month on the existing contract. Maxima was asked to provide its cost reimbursable proposal to provide the service for the following 2 years, which it did by letter of September 13, 1982. The letter also stated Maxima's belief that it should be paid for the initial contract term on the basis of the negotiated fixed-unit prices and minimum guarantees.

The parties met on September 24, 1982, to discuss a 1-month extension of the existing contract and the proposal for the following years on a cost-plus-fixed-fee basis. The parties disagree as to what, if anything, was agreed upon at the meeting. By letter dated September 27, 1982, Maxima discussed the meeting of September 24 and then stated:

The Maxima Corporation will agree to renegotiation of the subject contract to extend the period of performance for thirty (30) days without additional consideration, provided that the Environmental Protection Agency will agree to the following terms:

1. EPA will negotiate to effect the award of a sole-source contract to the Maxima Corporation for word processing, editing, and other production related services at a level of effort consistent with the enclosed statement of work (Enclosure B). This contract will be a cost-plus-fixed-fee contract for a twelve (12) month period of performance and will

include two (2), twelve (12) month option periods. The fixed fee for this agreement will not be less than 8% of the total estimated costs.

2. EPA will agree to approve and expeditiously process Maxima's invoice for all guaranteed minimum items under the current contract.

3. EPA will agree that production requirements for the thirty (30) day extension period will not exceed the requirements for the period August 2, 1982 through August 29, 1982 by more than 10%.

The acceptance of these terms is essential to re-negotiation.

Beside each of the numbered paragraphs are handwritten notations with the initials "JK" for James Kranda, the contracting officer. Beside paragraph 1 is the word "agreed," beside paragraph 2 are the words "when received EPA will process," and beside paragraph 3 appear the words "understood qty did not exceed."

Under date of September 21, 1982, modification 1 to the existing contract was prepared deobligating $40,000 from fiscal year 1981/1982 and reobligating $40,000 of fiscal year 1982/1983 funds, and extending the period of performance for 1 month through October 31, 1982. By voucher dated October 31, 1982, Maxima billed EPA for the month of October 1982, in the amount of $272,210.90. This amount was calculated by deducting previous billings of $152,661.50 from the total of the contract minimum dollar amounts of $420,534 leaving a balance of $267,872.50. To this was added the October lease costs (not in issue) of $4,338.40. The voucher was forwarded by the EPA finance office to the project officer, who checked the box next to the words "Goods or services have been delivered as requested by the contract to support this payment." It appears that this was the regular payment procedure and that the contracting officer did not see or approve the voucher. The voucher was paid on or about December 20, 1982.

In October 1983, the EPA Office of General Counsel learned that the voucher had been paid. By letter dated November 16, 1983, the EPA termination and claims contracting officer (successor to James Kranda) advised Maxima that EPA's failure to order the contract minimum quantities was a constructive termination of the contract for the convenience of the Government effective October 31, 1982, and requested Maxima to submit a termination settlement proposal in accordance with the termination clause by January 31, 1984. There has been no termination proposal submitted by Maxima. On May 31, 1984, the contracting officer issued a final decision demanding repayment to EPA of $233,974.05[1] after deducting estimated amounts for October 1982 equipment costs, production requirements, and termination expenses. Maxima appealed that final decision to this Board. EPA has requested this Board to order Maxima to submit a termination settlement proposal. Maxima counterclaims in an unspecified amount for the services performed in October 1982 plus interest thereon. EPA has moved to dismiss the counterclaim as premature because appellant did not submit the claim to the contracting officer for a final decision.

Appellant's motion is accompanied by an Appendix A entitled "Material Facts as to Which There is no Genuine Dispute" and contains a listing of 39 statements. Appellant argues that in lieu of exercising his right to terminate the contract for convenience, the contracting officer agreed to pay the guaranteed minimums in exchange for an added month of free services and a more favorable follow-on cost reimbursement contract. It contends that the Government received additional consideration for the bargain it made and that it cannot now upset the consummated agreement by claiming the actions of the contracting officer were based on a mistake in law and were beyond the scope of his authority. In the Government's response, counsel addressed each of the "Material

---

**1.** Amount changed to $229,635.65 by amendment of Government's complaint to correct mathematical error.

Facts" set out by appellant and showed specific disagreement, in whole or in part, with 18 of them. Most significant of these are the alleged material facts relating to consideration, on which appellant relies to underpin a new consummated agreement. Regarding Mr. Kranda's notations in the margin of the September 27, 1982, letter (statement 17), the Government contends the notations were not a confirmation of agreement to the three terms, but were added in the mid-to-late October 1982 time frame, nor were they discussed with any EPA or Maxima employee before or after their entry. Regarding statement 22 that the October services of Maxima were provided without added consideration, both the affidavits of the contracting officer and the project officer support the view that EPA did not expect the October services to be provided free, but were to be billed at the contract unit prices. Additionally, the Government challenges the fact contentions that the contracting officer and project officer agreed to pay the guaranteed minimums in return for the October services or the negotiation of a cost reimbursement contract. This is supported by the oft-repeated assertion of the contracting officer and project officer that they had always believed EPA to be obligated to pay the guaranteed minimums to Maxima regardless of the quantities ordered. Therefore, we found that there were disputed material facts concerning the alleged consideration for the agreement under which Maxima claimed entitlement and was paid the guaranteed minimums under the contract.

The Government's motion is based on the following propositions: (1) The contracting officer had no express authority to pay Maxima the guaranteed minimum. The argument here rests heavily on the presence in the contract of a payments provision, the "guaranteed minimum" provision, and the "Termination" clause and the need to read them together to give effect to all the contract terms. The interpretation of the minimum payment regardless of the amount of work produced is said to be contrary to the payment provision permitting payment only for completed work and would render the termination provision meaningless because it would prevent the Government from invoking it in the event minimum orders did not occur. The Government contends the contract did not authorize payment of a guaranteed minimum, but that those words simply represent the buyer's promise to order a minimum quantity, the failure of which would result in payment pursuant to the termination clause if invoked by the contracting officer or by operation of law and (2) a contracting officer has no authority to make agreements which violate the Federal procurement regulations, including those requiring an audit prior to certain agreements, those which violate the termination clause and the implementing regulations, and those placing limitations on his authority.

The Government's extensive arguments and citations are severely truncated here for the reason that the issues have not been joined in the pleadings. Appellant seeks to prove a new agreement supported by consideration and consummated by payment, and has addressed only in passing the many cases cited respecting the contracting officer's authority and those dealing with constructive termination of indefinite quantity contracts. Appellant relies on cases dealing with the authority of the contracting officer to make unwise or improvident agreements, and the Government relies on cases of contract interpretation, limits on the contracting officer's authority, constructive terminations, and erroneous payments.

### Discussion and Decision

In addition to a decision on the central question of law, the question of whether the termination clause of the contract can be asserted retroactively where guaranteed minimum quantities have not been ordered, the parties ask that the Board include in its decision an interpretation of the guaranteed minimum and payment provisions of this contract. As stated above, the parties did not join issue in the pleadings of this case, leaving much original research to the Board. That research has convinced the

Board that there can be little value placed on any interpretative analysis of a guaranteed minimum contract that purports to bind the Government to order or pay for any minimum quantities. Since *College Point Boat Corp. v. United States,* 267 U.S. 12 [45 S.Ct. 199, 69 L.Ed. 490] (1925), the availability of the termination for convenience right of the Government to escape liability for breach of contract damages or other contractual commitments, even when asserted retroactively, has been expanded as a doctrine of federal procurement law. There Mr. Justice Brandeis stated:

> A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact. He may, likewise, justify an asserted termination, rescission, or repudiation, of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later.

Thus, the right to retroactively assert the termination for convenience right was established long ago, in a case with striking similarities to the instant case. There, both parties were unaware of the availability of the termination option until long after the contract had been cancelled. Here, both parties mistakenly believed that the Government was liable to pay an amount equal to the cost of the guaranteed minimum quantities of services.

Later, in *John Reiner & Co. v. United States* [9 CCF ¶ 72,358], [325 F.2d 438] 163 Ct.Cl. 381 (1963), *cert. denied,* 377 U.S. 931 [84 S.Ct. 1332, 12 L.Ed.2d 295] (1964), the Court of Claims relied on *College Point* to extend the right of the Government to limit liability to the Termination provisions even though no action had been taken to invoke those provisions. Subsequently, the doctrine of constructive partial termination for convenience has been applied in many cases of requirements contracts and minimum quantity contracts where the Government failed to order all its requirements or the minimum quantity to limit the recovery to the compensation allowed under the terms of the termination clause. *See Manuals,*

*Inc.,* ASBCA 24123, 80–2 BCA 14,579, at page 71,882. It is clear from the precedents that the availability of the right to terminate for convenience, even though untimely asserted or not asserted at all, limits the liability of the Government to costs recoverable under the termination clause.

In the instant case, we are confronted with appellant's assertions that the contracting officer knowingly considered terminating the contract, chose not to do so, and entered into a new agreement for which there was consideration; thereby, preventing a constructive termination or an untimely act of termination by the Government after completion of the contract. We note that appellant's letter of September 27, 1982, agreed to a 30–day extension of the contract "without additional consideration" on condition that EPA will negotiate a follow-on contract with Maxima on a cost-plus-fixed-fee basis, that EPA would pay the invoice for the guaranteed minimum quantities, and that EPA would limit the services required during the 30–day extension.

In stating that the extension was agreed to "without additional consideration", appellant was relying on being paid for services rendered during the 30–day extension from funds already obligated on the contract. Both appellant and the contracting officer were ignorant of the fact that the Government was liable only for termination costs for the failure to order the minimum quantities. By agreeing that the 30–day extension was without additional consideration, appellant merely allowed the contract performance period to be extended. There were no amendments to the contract agreement, and therefore, the terms during the 30–day extension were the same as they were during the previous 12 months. The Government would order services during the extended period and pay for those services on acceptance. There was no new agreement, but simply an extension of the existing contract, expressly without consideration.

The first condition expressed in the letter was that a sole source contract be negotiated with Maxima on a cost-plus-fixed-fee

basis. EPA had asked Maxima for its cost reimbursable proposal for a new contract, which was provided by letter dated September 13, 1982. Stating this condition repeated EPA's intentions, that had already been communicated to Maxima, that EPA desired to contract with Maxima for continuing the services on a cost reimbursable basis. The 30-day extension, given without consideration, was for the purpose of avoiding interruption of securing the services. The condition that a new CPFF contract be negotiated with Maxima related to EPA's expressed intentions, Maxima's proposal of September 13, and the prospective new CPFF contract. It did not relate to the existing contract, and we find no consideration for any new agreement in this condition.

The second condition of the agreement to pay an invoice for all guaranteed minimum items expressed the mutually held mistaken belief of the parties that the Government was liable for payment for the guaranteed minimum quantities. Under existing judicial determinations, no such liability existed. *See United States v. Amdahl Corp.* [786 F.2d 387] [33 CCF ¶ 74,266], No. 85-2760 (CAFC, Mar. 6, 1986). There, the court cites, with approval, a law journal article dealing with the limits placed on the authority of Government agents to act by statute, regulation, and judicial and administrative determinations. The cases discussed *supra* clearly limit the Governments liability for failure to order contract minimums, and it would follow that the case law also limited the authority of the contracting officer to make payments for services not rendered and for which there is no liability. Whether the contracting officer agreed with this second condition or not is of no consequence. He had no authority to do so and could not bind the Government to make such payments. Appellant is charged with knowledge of the longstanding judicial restrictions of the Government's liability in minimum quantity

contracts, and could not rely on the contracting officer's unauthorized promise to make payments for which the Government was not liable. The unauthorized promise of the contracting officer to do so cannot be found to be consideration.

The third condition restricting production requirements during the 30-day extension period to no more than 10 percent over the production requirements for August 1982, relates to the existing contract. James Kranda's notation beside this condition of "understood qty did not exceed" is in the past tense, indicating that the work requirements for October had been completed when the notation was made. This is also supportive of the Government's position that the notes placed on the letter were written sometime after the extended contract had been completed. In any case, the limitation on the production requirements during the 30-day extension did not benefit the Government, but rather protected appellant from requirements that might exceed appellant's capacity to perform. We find no consideration for any new agreement in this condition.

Having found there was no new agreement, nor any consideration for one, we conclude that the contracting officer was without authority to agree to pay for the unordered production requirements under the contract. The payment of the invoice was unauthorized and therefore mistaken. Such funds paid under a mistake of law must be refunded. *DiSilvestro v. United States*, 405 F.2d 150 (2d Cir.1968), *cert. denied*, 296 [396] U.S. 964 [90 S.Ct. 441, 24 L.Ed.2d 429] (1969). In the circumstances of this case, and based on the authorities cited, we conclude that the original contract was constructively terminated for the convenience of the Government on October 31, 1982.[2]

Appellant's counterclaim for compensation in an unspecified amount for services for the month of October 1982 is subsumed in our quantum determination which is

---

**2.** The effect of the case law is to void any guarantees concerning minimum quantities promised by the Government by the operation of the Termination rights. We note that some agencies have undertaken to warn contractors in the contract that failure to order minimum quantities will result in payment in accordance with the termination clause. This practice should be encouraged to avoid misleading contractors with unenforceable promises.

predicated on the Government's computation based on the sound standard of services not exceeding the August 1982 requirements, a known quantity. Clause 12 of the contract provides that the contractor's termination claim shall be submitted within 1 year after the effective date of termination, and thereafter for the unilateral determination of the amount owing the contractor by the contracting officer. We see no useful purpose in remanding this long-standing dispute for negotiation of the termination settlement.

The appeal is denied. Maxima has refused to provide its termination settlement proposal. The Government computed an amount by allowing $32,236.85 for the October requirements ordered, $4,338.40 for October equipment costs, and $6,000 for termination settlement expenses. This reduces the overpayment to $229,635.65, which Maxima is hereby ordered to repay to the Government, together with interest computed pursuant to P.L. 92–41 (85 Stat. 97) (Clause 34 of the contract) from May 31, 1984, the date of the final decision demanding repayment.