**STOCK EQUIPMENT COMPANY, A UNIT OF GENERAL SIGNAL CORPORATION, Plaintiff–Appellee,**

v.

**TENNESSEE VALLEY AUTHORITY, Defendant–Appellant.**

**No. 88–7270.**

United States Court of Appeals, Eleventh Circuit.

July 19, 1990.

Charles W. Van Beke, Harriet A. Cooper, Philip J. Pfeifer, TVA, Knoxville, Tenn., for defendant-appellant.

James L. Goyer, III, Maynard, Cooper, Frierson & Gale, Birmingham, Ala., Donald J. Mulvihill, Thomas W. Andrews, Eric B.

Henry, Cahill, Gordon & Reindel, Washington, D.C., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, CLARK, Circuit Judge, and RYSKAMP *, District Judge.

TJOFLAT, Chief Judge:

The Tennessee Valley Authority (TVA) appeals from a decision of the district court, entered after a bench trial, awarding $2,988,544 to Stock Equipment Co. (Stock) pursuant to a "termination for convenience" clause in a contract between the parties. We affirm. Because the resolution of the parties' dispute hinges on an understanding of the contractual relationship between TVA and Stock, which itself hinges in part on the extent to which the provisions of a separate contract between TVA and a third party were made applicable to the TVA–Stock contract, we set out the facts in some detail.[1]

## I.

Stock, primarily a manufacturer of equipment for fossil-fueled electric generating plants, began in the 1970's to design and manufacture radioactive waste solidification systems for nuclear power plants. Aerojet Energy Conversion Company (Aerojet) designed and manufactured equipment that reduced the volume of radioactive waste prior to solidification. A successful solidification system must be compatible with the volume-reduction system with which it is paired. Aerojet and Stock cooperated in making their systems com-

---

* Honorable Kenneth L. Ryskamp, U.S. District Judge for the Southern District of Florida, sitting by designation.

1. TVA asserts, without contradiction by Stock, that federal government contract law controls the interpretation of the contract. The contractual relationship between TVA and Stock, however, exists only because a third party, Aerojet Energy Conversion Company, which had entered into a prime contract with TVA, assigned its subcontract with Stock to TVA. See discussion in text *infra.* Thus, although contracts to which TVA is an original party are governed by federal law, *see TVA v. Mason Coal, Inc.,* 384 F.Supp. 1107, 1115 (E.D.Tenn.1974), *aff'd,* 513 F.2d 632 (6th Cir.1975), this dispute arises from a subcontract between private parties, and whether federal or state law controls such a subcontract is unsettled. *See United States v. William F. Klingensmith, Inc.,* 670 F.2d 1227, 1230 n. 13 (D.C.Cir.1982). We do not decide the issue, because "nothing we decide contradicts either body of law." *Id.*

patible, and, thereafter, were able to act as a "bidding team" to bid their reduction and solidification systems as a package. In some instances, Aerojet would bid as the prime contractor, and Stock would offer its solidification system as a subcontractor to Aerojet.

### A. The TVA–Aerojet Contract.

The following facts are undisputed. On May 20, 1980, TVA issued a Request for Proposal (RFP) for the design and construction of systems to reduce and solidify radioactive waste produced at TVA's Sequoyah and Watts Bar nuclear facilities. Aerojet responded to the RFP, and on April 2, 1981, TVA and Aerojet entered into a $14,939,602 contract, No. 81K68–827379 (the TVA–Aerojet contract), which named Stock as the proposed subcontractor for the solidification system. The contract incorporated the terms and conditions of the RFP as amended by two formal addenda (dated May 23, 1980 and June 19, 1980), Aerojet's fill-in-the-blank responses to the RFP (relating to price, payment schedules, guaranteed data, technical proposals, etc.), several volumes of technical specifications, and, referenced on the "Acceptance Page," a series of letters and other documents that added to, altered, or clarified terms appearing elsewhere. TVA and Aerojet contemplated that Aerojet would eventually assign its subcontract with Stock to TVA;[2] accordingly, the TVA–Aerojet contract contained separate price and payment schedules for Aerojet's volume-reduction work and for Stock's solidification work. As awarded on April 2, 1981, the contract allocated $8,354,000 of the total price to Aerojet's portion of the work and $6,585,602 to Stock's portion of the work. Of the total price for each portion, the percentage representing "the initial phase of contract (engineering, design, and associated software work)" was stated to be twenty percent for Aerojet and sixteen percent for Stock. This latter information was included in the contract by virtue of two letters plus attachments from TVA to Aerojet, dated December 31, 1980 (12/31/80 letters) and Aerojet's responses, all of which were referenced on the Acceptance Page.

The TVA–Aerojet contract contained an extensive "Termination for Convenience" provision, included in the original RFP, which permitted TVA unilaterally to terminate the contract.[3] Under this provision, TVA was obligated to pay Aerojet any actual costs (including both costs of performance and costs of escaping commitments to third parties made in connection with performance) plus a reasonable profit on work already performed; anticipated profit on the remaining work, however, was not recoverable. Additionally, the contract contained a cancellation clause by virtue of the 12/31/80 letters (plus attachments) incorporated by reference on the Acceptance Page. The cancellation clause acknowledged the two-step nature of the contract—i.e., first design, then build—by providing that TVA could cancel the contract after reviewing Aerojet's designs "without further liability or obligation of TVA" (with the presumable exception of progress payments due and owing for work completed). The clause was added in order to limit TVA's obligation to pay development costs for a system that could not function or that could not be developed in a timely manner.

---

2. By taking assignment of the Aerojet–Stock subcontract, TVA assumed the responsibility of administering that contract; it thereby saved a significant "contract administration" fee that it would otherwise have paid to Aerojet. During the preliminary stages, however, TVA apparently preferred to negotiate with only one contractor.

3. A "termination for convenience" clause is common in contracts to which the United States Government is a party. See Maxima Corp. v. United States, 847 F.2d 1549, 1552 (Fed.Cir. 1988). See generally Harley, Economic Duress and Unconscionability: How Fair Must the Government Be? 18 Pub.Cont.L.J. 76 (1988). It permits the Government to terminate a contract, even in the absence of fault or breach by the other party, without incurring the usual financial consequences of breach. Maxima Corp., 847 F.2d at 1552. The other party, "instead of receiving compensation for governmental breach of contract based on classical measures of damages, is limited to recovery of 'costs incurred, profit on work done and the costs of preparing the termination settlement proposal.'" Id. (quoting R. Nash & J. Cibinic, Federal Procurement Law 1104 (3d ed. 1980)).

## B. The Aerojet–Stock (TVA–Stock) Contract.

The following facts are undisputed unless otherwise noted. During its negotiations with TVA, Aerojet was simultaneously negotiating its anticipated subcontract with Stock. In January 1981, Stock received from Aerojet a copy of the 12/31/80 TVA letters, which included the request for an estimate on "initial phase" (design) costs and the cancellation provision. Stock claimed at trial that, in keeping with its longstanding policy of not selling engineering without the accompanying construction, Stock informed Aerojet that it could not enter into a contract containing that type of cancellation clause. In any event, the parties stipulated that the issue of whether the clause would be part of the Aerojet–Stock contract was not explicitly discussed after January or February 1981.

On May 20, 1981, Aerojet and Stock entered into a contract, Purchase Order L–821205 (Purchase Order)[4], for the design and construction of the waste solidification systems. In an introductory section, the Purchase Order stated that "Stock Equipment Company agrees to supply the following equipment in accordance with Contract 81K68–827379 dated 4/2/81 incorporated herein." The Purchase Order also contained the following provision: "The requirements of this order shall be fulfilled in accordance with the terms and conditions of [the] TVA RFP ... except as modified below." The Purchase Order was amended by a change order, effective July 9, 1981, which, in a section entitled "Reference" (Reference 4), expressly incorporated seven letters from Aerojet to TVA—dealing primarily with technical specifications, price revisions, and revisions in delivery and payment schedules—into the Aerojet–Stock contract. The referenced letters were among those listed on the Acceptance Page of the TVA–Aerojet contract; the 12/31/80 letters from TVA to Aerojet containing the

cancellation clause, however, were not included in Reference 4. Nothing in the change order expressly relieved Stock of any obligations it may have undertaken in the Purchase Order to comply with the commercial terms and conditions of the TVA RFP or with the TVA–Aerojet contract.

## C. The "Agreement of Assignment."

Aerojet assigned the Aerojet–Stock contract to TVA by an agreement, entitled "Agreement of Assignment," to take effect on July 9, 1981. Under the terms of this agreement, (1) TVA agreed to be bound by all the terms and conditions of the Aerojet–Stock contract, (2) assumed all obligations of Aerojet as if TVA were the original contracting party, and (3) ratified and confirmed all actions taken by Aerojet with respect to the Aerojet–Stock contract. Nothing in the agreement purported to modify the Aerojet–Stock contract in any way. The document recited that Stock recognized TVA as Aerojet's "successor in interest in and to the assigned Contract"[5] and bore Stock's signature, as well as those of Aerojet and TVA. Thus, the existing Aerojet–Stock contract, in its entirety, became the TVA–Stock contract.

## D. The Dispute.

Between April 7, 1981 and November 18, 1983, Stock and Aerojet performed under their respective contracts with TVA. In October 1983, however, before TVA had approved Stock's design and authorized fabrication, TVA's Board of Directors voted to terminate the TVA–Aerojet and the TVA–Stock contracts. On November 3, 1983, TVA's Chief of the Nuclear Engineering Support Branch ordered the agent supervising the two contracts, David Marks, to "immediately terminate the [Aerojet] and [Stock] contracts in accordance with the *Termination for Convenience* provisions of the contract." (Emphasis added.)

---

4. We refer to the Purchase Order as amended by a subsequent change order as the Aerojet–Stock contract.

5. The agreement did not clearly express the parties' intent to create a novation whereby Aerojet would be released entirely from all contractual obligations to Stock. We need not decide whether a novation in fact occurred, since Aerojet's continuing liability to Stock is not relevant to the issues before us.

Possibly in an effort to save money for TVA by invoking the more favorable cancellation clause, Marks notified Stock by letter dated November 18, 1983 that TVA had "decided to cancel" the TVA–Stock contract "as provided by the *cancellation provisions* of the subject contract (which are incorporated in the subject contract as a part of Contract 81K68–827379 with [Aerojet])." [6] (Emphasis added.)

Stock notified Marks that it would be submitting to TVA's Disputes Contracting Officer a termination for convenience claim. Marks replied that he considered the contract "cancelled," rather than "terminated for convenience," and that the cancellation clause applied because the 12/31/80 letters had been incorporated into the TVA–Aerojet contract and then into the Aerojet–Stock/TVA–Stock contract. Stock took the position that the termination for convenience provision had been incorporated into the Aerojet–Stock contract and established the same contractual rights and obligations between Aerojet (with TVA as its successor) and Stock as between TVA and Aerojet, but Stock denied that the 12/31/80 letters had been incorporated. Stock then submitted a termination for convenience claim for $1,688,132. The Disputes Contracting Officer denied the claim without addressing the dollar amount on the ground that the cancellation provision, rather than the termination for convenience provision, applied. Stock filed a complaint in the United States District Court for the Northern District of Alabama, challenging the denial of the termination for convenience claim.[7] When the Disputes Contracting Officer subsequently denied a breach of contract claim submitted by Stock, Stock amended its complaint to challenge the denial of its breach claim as well. Stock also amended the complaint by increasing the amount of its termination for convenience claim to $2,317,409 plus interest.

Prior to trial, the parties informed the court that they understood their contract as permitting TVA to terminate for convenience. They disagreed, however, about the applicability of the cancellation provision. Thus, during the six-day bench trial, the parties disputed whether the TVA–Aerojet cancellation clause had become a part of the Aerojet–Stock/TVA–Stock contract, whether TVA had in fact invoked the termination for convenience provision or had breached the contract by attempting to cancel it, and the calculation of the costs that Stock would be entitled to recover on its breach and termination for convenience claims. The district court entered findings of fact and conclusions of law as required by Fed.R.Civ.P. 52. It held that Stock had not prevailed on its breach of contract claim but awarded Stock approximately $3,000,000 on its termination for convenience claim. Specifically, the district court found that the cancellation provision was not incorporated into the Aerojet–Stock/TVA–Stock contract and that TVA's Board of Directors had in fact authorized only a termination for convenience. The district court therefore made findings concerning the dollar amount owed to Stock under the termination for convenience provision: it found that after credits for progress payments, TVA owed Stock $2,317,409, plus $671,135 in interest, for a total of $2,988,544. The court entered judgment accordingly.

TVA appeals from that judgment, raising the following grounds of error. First, TVA asserts that the district court erred as a matter of law in holding that the entire prime contract between TVA and Aerojet was not incorporated into the subcontract between Aerojet and Stock; in a variation on that argument, TVA also asserts that the court erred as a matter of law in holding that the prime contract's cancellation clause in particular was not incorporated into the subcontract. Second, TVA contests as clearly erroneous the district court's finding that TVA's Board of Directors terminated the TVA–Stock contract

---

**6.** TVA sent a similar letter to Aerojet on the same date.

**7.** Stock elected not to appeal to the TVA Board of Contract Appeals but to bring its action di-

rectly in the district court pursuant to 28 U.S.C. § 1337 (1988) and 41 U.S.C. § 609(a)(2) (1982).

for convenience, rather than cancelling the contract. Third, TVA asserts in the alternative that the dollar amount awarded on Stock's termination for convenience claim was improperly calculated. We discuss each assertion in turn.

## II.

### A.

■ Because the parties informed the district court prior to trial that they interpreted their contract to include a termination for convenience provision, the manner in which that provision became part of their contract was not then, nor is it now, at issue. Stock does not challenge the district court's holding that TVA did not breach the contract, so the issue of breach also is not before us. Therefore, if this court concludes, as did the district court, that no other provision for ending the contract transcends the termination for convenience provision, we have only to review the amount awarded to Stock on Stock's termination for convenience claim. First, however, we turn to the more intricate question of whether the cancellation provision of the TVA–Aerojet contract became part of the Aerojet–Stock/TVA–Stock contract, and, if so, what its legal effect was on the contractual relations between TVA and Stock. We emphasize at the outset that a direct contractual relationship between TVA and Stock exists only by virtue of Aerojet's assigning the Aerojet–Stock contract to TVA. TVA, therefore, stands in Aerojet's shoes, and its contractual rights and obligations are no more and no less than those conferred by the Aerojet–Stock contract upon Aerojet.

In support of its position that the Aerojet–Stock subcontract incorporated the cancellation provision of the TVA–Aerojet prime contract, TVA relies on two sections of the Aerojet–Stock contract: the Introductory Reference ("Stock Equipment Company agrees to supply the following equipment in accordance with Contract 81K 68–827379 [the Aerojet–TVA contract] dated 4/2/81 incorporated herein"); and the Terms and Conditions Clause ("The requirements of this order shall be fulfilled in accordance with the terms and conditions of TVA RFP 68–827379 except as modified below").

According to TVA, the Introductory Reference clearly and unambiguously incorporates the entire TVA–Aerojet contract into the Aerojet–Stock contract, and that incorporation creates no ambiguity in the contract as a whole. TVA points to well-established principles of contract law: (1) "[I]t is settled doctrine that a reference in a contract to another writing, sufficiently described, incorporates that writing," *Lowry & Co. v. S.S. Le Moyne D'Iberville*, 253 F.Supp. 396, 398 (S.D.N.Y.1966), *appeal dismissed*, 372 F.2d 123 (2d Cir.1967); (2) "A contract's meaning is to be determined by its language, without resort to extrinsic considerations, unless the language is ambiguous," *Eatmon v. Bristol Steel & Iron Works*, 769 F.2d 1503, 1518 (11th Cir.1985); and (3) "The words of the contract are to be given their plain and ordinary meaning," *Universal Towing Co. v. United Barge Co.*, 579 F.2d 1098, 1101 (8th Cir.1978). TVA argues that the district court erred as a matter of law in disregarding the "express language" of incorporation, implicitly holding that the contract was ambiguous, and then considering extrinsic evidence to determine the parties' intentions.

TVA urges us to conclude that the contract, with all of its incorporated provisions, is unambiguous. It would have us proceed by looking only at the language of the TVA–Stock contract and by giving that language its "plain and ordinary meaning." We need not determine, however, whether the TVA–Stock contract (with incorporated provisions) is in fact ambiguous: our construction of the contract as ambiguous or unambiguous would result in no relief for TVA.

### 1.

Suppose we concluded, first, that the Introductory Reference of the Aerojet–Stock contract unambiguously incorporated the TVA–Aerojet contract in its entirety. As TVA argues, the cancellation provision of the TVA–Aerojet contract would then, indisputably, be part of the Aerojet–Stock

contract. Then we would be faced with the task of deciding whether the resulting contract as a whole—including the incorporated language—is ambiguous. If we consider the *entire Aerojet–Stock contract*—including the cancellation clause—without resort to extrinsic considerations, we can conclude that the contract is unambiguous only if we can give effect to the "plain and ordinary meaning" of its "express language." The cancellation provision reads:

> *Contractor* [Aerojet] shall proceed with the work under this contract in accordance with the following:
>
> ....
>
> [Upon conclusion of a status review,] *TVA* will inform *Contractor* in writing whether it desires to ... (c) cancel the remaining portion of the work under the contract.
>
> ....
>
> In the event *TVA* elects to proceed under (c) above, such cancellation will be without further liability or obligation of *TVA*.

(Emphasis added.)

It becomes evident, under the mode of construction urged by TVA, that the cancellation provision of the TVA–Aerojet contract may have become *part of the contract* between Aerojet and Stock, but it could have no effect on the *legal relations* between Aerojet and Stock. Stock was not a party to the TVA–Aerojet contract: Aerojet, not Stock, was the named "Contractor." The clause, in its literal terms, governs only the legal relations between Aerojet, who happened to enter into a subsequent contract with Stock, and TVA. The party limiting its liability for cancellation is TVA, not Aerojet; the "Contractor" agreeing to the liability limitation is Aerojet, not Stock. Thus, although Aerojet and Stock were free to "incorporate by reference" anything they chose into their contract— and may have done so with respect to the TVA–Aerojet contract—it does not follow that the incorporated matter has any effect on the contractual rights and obligations that exist between them.

For the language of the incorporated cancellation provision to have any legal effect on Aerojet's (and, as Aerojet's assignee, TVA's) contractual relations with Stock, something more is needed. TVA must invoke an analogy: the same legal relations that obtain between TVA (as Owner) and Aerojet (as Contractor) also obtain between Aerojet (as Contractor) and Stock (as Subcontractor); thus, Aerojet may cancel its subcontract with Stock under the same terms and conditions as TVA may cancel the prime contract with Aerojet. The only way to establish the analogy without going outside the Aerojet–Stock contract is to point to its presence *in* the contract.[8] Nothing in the documents that form the complete Aerojet–Stock contract, however, including the (presumably) incorporated TVA–Aerojet contract, expresses the necessary analogy.[9] Even assuming that the Terms and Conditions Clause is sufficient to create such an analogy, that clause im-

---

**8.** Subcontracts often contain clauses that expressly create a relationship between prime contractor and subcontractor analogous to that between owner and prime contractor. *See, e.g., Pierce Assocs., Inc. v. Nemours Found.,* 865 F.2d 530, 536–37 (3d Cir.1988) (subcontract bound subcontractor "to the *Contractor* by the terms and conditions of the [prime contract] ... and to assume toward the *Contractor* all the obligations and responsibilities that the *Contractor* ... assumes toward the *Owner*" (emphasis in original)), *cert. denied,* — U.S. —, 109 S.Ct. 3218, 106 L.Ed.2d 568 (1989); *Smith v. United States,* 497 F.2d 500, 509 (5th Cir.1974) (same); *J.S. & H. Constr. Co. v. Richmond County Hosp. Auth.,* 473 F.2d 212, 213–14 n. 3 (5th Cir.1973) (same); *Seger v. United States,* 199 Ct.Cl. 766, 469 F.2d 292, 298 n. 19 (1972) (subcontract provided that "Subcontractor shall be bound by all the terms and conditions of the General Contract, and its plans and specifications, and shall strictly comply therewith. All rights and remedies reserved to Owner under the General Contract shall apply to and be possessed by Contractor in its dealings with Subcontractor"); *Edward E. Morgan Co. v. United States,* 230 F.2d 896, 899 (5th Cir.) (subcontractor agreed "[to] be governed by the same regulations, as to wages, etc., that we are under the terms of our [prime] contract"), *cert. denied,* 351 U.S. 965, 76 S.Ct. 1030, 100 L.Ed. 1485 (1956).

**9.** This disposes of TVA's argument on appeal that the district court ignored the parties' stipulation that the Aerojet–TVA contract was incorporated into the Aerojet–Stock contract. Incorporated material is irrelevant to a contract dispute if the incorporated material has no effect on the legal relations between the contracting parties.

ports only the terms and conditions of the TVA *RFP* into the Aerojet–Stock contract; the RFP, originally and as formally amended, did not contain the cancellation provision. In sum, if we are to look solely at the language of the entire contract and to construe that contract as unambiguous, as TVA would have us do, we can only note that the contract between Aerojet and Stock incorporates a description of legal relations existing between another set of contracting parties. We cannot assume that those relations have any effect on the relations between Aerojet and Stock. Thus, if the provisions of the contract are construed as unambiguous, they unambiguously afford no relief to TVA.

2.

The analogy discussed above might also be established by demonstrating that persons with experience in the field of government contracting understand that even an imprecise incorporation provision in a subcontract, referencing the prime contract, is normally intended to establish contract terms between prime and sub analogous to those existing between government and prime. TVA cannot establish the analogy, however, without invoking custom and usage, which is to call for consideration of factors extrinsic to the contract. Invocation of custom and usage would, therefore, contradict TVA's own premise that the contract itself, given the plain and ordinary meaning of its language, is unambiguous; indeed, it would amount to an admission of the opposite—that the contract *is* ambiguous and thus requires extrinsic evidence to clarify and explain the parties' intended meaning.

■ Such an admission would obviously be contrary to TVA's interests. For, once the door of contractual ambiguity is opened, a court may take any relevant extrinsic evidence that does not contradict or vary the terms of the written contract to establish the parties' intent, *see generally* Restatement (Second) of Contracts §§ 215, 216 (1981), and the district court in this case did precisely that. The court heard extensive testimony from two Stock con-

tract negotiators who explained (1) that the parties to the Aerojet–Stock contract understood that the plans and specifications of the TVA–Aerojet contract (and the terms of specifically referenced documents) would be incorporated into the Aerojet–Stock contract and made applicable to Stock, (2) that the parties understood that Stock refused to enter into a contract with the cancellation terms proposed by TVA for its contract with Aerojet, and (3) that the sixteen percent figure, supplied by Stock to identify the portion of Stock's work attributable to the design phase, did not represent a separate (and potentially final) project, but was understood as an estimate to enable the parties to structure progress payments throughout the course of the entire contract. The court found that the limited purpose of the Introductory Reference was to "identify[ ] the equipment ordered," and that the sixteen percent figure was merely an estimate to facilitate progress payments; the court concluded that Aerojet and Stock did not intend to incorporate into their contract a cancellation provision similar to the one in the TVA–Aerojet contract. The determination of the parties' intent is a factual finding that will not be reversed by an appellate court unless it is clearly erroneous. *See Brewer v. Muscle Shoals Bd. of Educ.*, 790 F.2d 1515, 1519 (11th Cir.1986) (per curiam). Having reviewed the extensive evidence taken by the district court on the question of the parties' intent, we note that, if TVA were to challenge the district court's finding of "no intent to incorporate" as clearly erroneous, we would reject the challenge.

3.

Therefore, regardless of how the district court conceptualized the matter, there is no error harmful to TVA in the result the court reached. If the contract was unambiguous and the court improperly considered extrinsic evidence in interpreting its meaning, the incorporated cancellation provision of the prime contract, governing *TVA's* liability to *Aerojet*, nonetheless had no effect on the legal relationship established in a subsequent subcontract between

*Aerojet* and *Stock.* On the other hand, if the contract was ambiguous, then the court's consideration of extrinsic evidence to interpret the parties' intent was legally correct and its finding that the parties did not intend to be governed by cancellation terms similar to those of the TVA–Aerojet contract is supported by substantial record evidence and is not clearly erroneous. In either case, TVA cannot prevail in its contention that the Aerojet–Stock contract permitted Aerojet (and TVA as Aerojet's assignee) to invoke the TVA–Aerojet cancellation provision when ending its contract with Stock.

#### B.

Because we hold that the TVA–Aerojet cancellation provision did not apply between TVA and Stock, we do not address TVA's assertion that the district court clearly erred in finding that TVA authorized only a termination for convenience rather than a cancellation. At trial, Stock claimed that TVA breached the contract by purporting to cancel it without the benefit of a cancellation provision. Thus, although the district court held, as we do, that the cancellation provision was not applicable, the district court had to determine whether TVA had authorized a cancellation or a termination for convenience in order to dispose of Stock's breach of contract claim. As noted earlier, Stock has not challenged the district court's rejection of its breach of contract claim, so the factual issue of cancellation rather than termination is not before us.

#### C.

There remains for our consideration TVA's challenge to the district court's award of $2,317,409 under the termination for convenience provision of the Aerojet–Stock/TVA–Stock contract. TVA's assertion of error is essentially twofold: (1) the district court entered findings that are both contradictory and inadequate as a matter of law; and (2) certain of the court's find-

ings on particular costs claimed by Stock are erroneous.

#### 1.

We need address only briefly TVA's contention that the district court's findings are inadequate.[10]

▇ Fed.R.Civ.P. 52(a) requires a district court sitting without a jury to find the facts with enough specificity for a reviewing court to identify the factual findings upon which the court's legal conclusions are based. *See Feazell v. Tropicana Products, Inc.,* 819 F.2d 1036, 1041–42 (11th Cir.1987). *See generally* 5A J. Moore & J. Lucas, Moore's Federal Practice ¶ 52.06[1] (2d ed. 1989). Although there must be sufficient record evidence to support the findings, they need not "state the evidence or any of the reasoning upon the evidence," *Petterson Lighterage & Towing Corp. v. New York Central R.R.,* 126 F.2d 992, 996 (2d Cir.1942), nor "assert the negative of rejected propositions," 5A J. Moore, *supra* ¶ 52.06[1] at 143–44. *See Western Pacific Fisheries, Inc. v. SS President Grant,* 730 F.2d 1280, 1285 (9th Cir.1984) ("We presume that the judge considers all of the evidence, and relies on so much of it as supports the finding and rejects what does not support the finding, unless the judge states otherwise."). Rather, "the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for overelaboration of detail or particularization of facts." Fed.R.Civ.P. 52 advisory committee's note.

▇ The district court in this case first stated some of its factual findings discursively. Then, using as its framework the lists of disputed factual contentions submitted by each party before trial, the court methodically reviewed every item on both lists and, with respect to each contention still relevant to the case, stated whether the contention was proven or not proven. In many instances, the court expressly re-

---

10. TVA contends that the district court's findings are contradictory with respect to the award of settlement costs. We therefore address this

contention in our discussion of TVA's challenge to the amount awarded for legal fees and other settlement costs. *See infra* part 2.d.

worded or added to the party's statement of the factual contention in order to clarify the precise extent of the finding. The result is a detailed, annotated list of findings that leaves no doubt about what the court found with respect to each relevant factual element in the case or about the level of care and attention exercised by the court in reaching its findings. We therefore hold that the district court's findings are adequate.

### 2.

#### a.

■ The largest single element in Stock's termination claim was "engineering costs": the product of the engineering hours spent on the TVA contract multiplied by the company's hourly rate for engineering. TVA asserts that the district court erred in accepting (1) the total number of engineering hours attributed by Stock to the TVA project and (2) the hourly engineering rate applied by Stock.

Stock claimed that a total of 45,934 engineering hours were spent on the TVA contract. To isolate these engineering hours and to charge TVA accordingly, Stock used the "beneficial relationship" method. While Stock was performing work on the TVA contract, Stock engineers were also working on other contracts, some of which involved the design of substantially equivalent components. In 1981 and 1982, Stock's timekeeping system required engineers to fill out time cards and assign their time to certain numbered design tasks and subtasks; blocks of time were not assigned to individual contracts. This enabled Stock to identify the total number of engineering hours spent on each task and subtask. For purposes of claim preparation, Stock would then identify all the contracts that called for these design tasks and subtasks and would allocate the work among them in proportionate shares. In 1983, Stock began to identify its engineering hours by contract, in addition to task and subtask. Under this "lead contract" system, when a customer required a component before other customers, the engineers designing the component would enter a number identify-

ing that customer's contract. Stock witnesses testified that hours were still not "charged to" particular contracts, however: in preparing a termination claim, Stock would look beneath the contract number to the task and subtask numbers and would allocate costs among all contracts that required the same component and benefitted from its design. Thus, for example, when TVA and another customer required a virtually identical component but the other customer required it at an earlier date, engineers were told to enter a number that identified the other contract. This timekeeping system accurately reflected the total number of engineering hours spent designing a particular component, and under ordinary circumstances, Stock required no further breakdown. When TVA terminated its contract, however, Stock was forced to break the work down into shares attributable to each customer. It did so by dividing the total engineering hours by two, multiplying the quotient by the engineering rate, and charging the resulting amount to TVA.

TVA protests the application of the beneficial-relationship method. According to TVA, because the termination for convenience clause states merely that "costs incurred in the performance of the work"— and not "costs beneficially related to the performance of the work"—are recoverable, only the 10,052 hours actually attributed on Stock's books to TVA projects are properly chargeable to TVA in Stock's termination claim. TVA asserts that the district court erred in applying, *sub silentio*, Federal Acquisition Regulation (FAR) or Federal Procurement Regulation (FPR) cost principles—which endorse the beneficial-relationship method—to a contract that does not incorporate those principles.

TVA's assertion is plainly incorrect. On several issues, including the allocation of engineering hours, the court allowed testimony as to the reasonableness of a particular accounting method and allowed the witness to explain that he considered the method reasonable because it was *endorsed* by FAR, or FPR, or generally accepted accounting principles (GAAP).

Stock's accounting expert, Paul Carren from the accounting firm of Peat, Marwick & Main, testified that the beneficial-relationship method is a reasonable and accepted way of isolating and attributing costs in a termination for convenience claim. Moreover, the court left no room for doubt about its understanding that FAR (or FPR) did not control the contract, as is evident from the court's response to TVA counsel:

> I understand that TVA is not bound by FAR, I understand that. But I understand that TVA's not bound by GAAP, either. That, in effect, we're looking at what an accountant might do as a professional person in computing whatever he's about to compute or audit using whatever principles he thinks might have some application to the task that he's about to do....

TVA's own accounting expert, Dr. James Scheiner, testified that there was no single authoritative body of cost accounting principles governing the allocation of hours in a termination claim. The court and Dr. Scheiner engaged in the following colloquy:

> THE COURT: But is the allocation approach incorporated in FAR a fair allocation approach? Even though we would say that FAR does not govern or control this contract, would the principle that FAR has be one cost accounting principle that could be fair?
>
> THE WITNESS: I think that's a determination you have to make, your Honor.
>
> THE COURT: Well, but I'm asking you, is the principle as you understand FAR a fair cost accounting principle?
>
> THE WITNESS: I think it probably is fair. I think there's a better cost accounting principle; and that is, what have they recorded on their books.
>
> THE COURT: Okay. But is it a fair cost accounting principle?
>
> THE WITNESS: Yes.

Thus it is abundantly clear that, if the court accepted the beneficial-relationship method of allocating engineering hours, it did so not because the contract demanded application of that method but because the accounting profession recognized it as reasonable and fair.

With respect to the hours claimed by Stock, two Stock executives—William Phillips, Contract Manager, and Ronald McIntyre, Vice President of Finance—used engineering time cards and computer analyses of time cards to explain how Stock had derived the total number of hours claimed. With ample testimonial and documentary support in the record, the district court found that Stock had spent 45,934 hours on the TVA job.[11] No error underlies the court's finding.

■ TVA also challenges the district court's acceptance of the engineering rate used by Stock in figuring engineering costs. Stock defended its rate for direct engineering hours in part based on a Defense Contract Audit Agency (DCAA) audit of Stock's timekeeping system, performed in connection with an unrelated termination claim but covering the same years as the TVA claim. The DCAA audit had verified the rate proposed by Stock and had found it reasonable.[12] Stock executives and two accountants hired to assist Stock in preparation of its termination claim testified that the DCAA audit confirmed the methodology employed by Stock in developing its engineering rate and that the rate itself was reasonable.

According to TVA, even if the rate was correct, it was incorrectly applied to an overbroad man-hour base. The argument runs as follows: Stock used a man-hour base consisting of support personnel as well as engineers and also included hours spent by engineers in administrative work; the costs of support personnel and administrative work were already included as over-

---

**11.** Specifically, the court found that Stock spent 5,004 hours in 1981, 15,721 hours in 1982, and 25,209 hours in 1983.

**12.** For the TVA termination claim, Stock used the rate developed in connection with the unrelated claim for basic "direct engineering hours." It then adjusted that rate for cost of sales, general and administrative costs, and profit—factors that had not been fully included in the other claim. These adjustments were explained at trial, and Stock's accounting expert, Paul Carren, testified that they were both accurate and reasonable.

head expense in Stock's hourly engineering rate; therefore, multiplying the hourly engineering rate by the hours of support personnel and hours spent by engineering personnel in administrative work (indirect hours), as well as by the hours of engineers performing direct design tasks (direct hours), resulted in double recovery of the indirect expenses; the correct approach would be either to apply a lower rate to all personnel or to apply the higher rate only to hours actually spent on direct engineering work.

TVA's accounting expert, Dr. Scheiner, raised the above concern on the assumption that only the "E", "R", and "S" (Proposal, Repair, and Shop) project-account categories in Stock's 1983 timekeeping system reflected direct hours, whereas the "D" (Development) category reflected only indirect hours. This was a plausible assumption, since the key displayed on Stock's time sheets as a guide for employees lists the Proposal, Shop, and Repair categories as "Direct" and the Development category (along with Product Improvement and Administration/Overhead) as "Indirect." The question of direct versus indirect hours was explored at trial, however. Stock executives Phillips and McIntyre testified that certain entries under "D" represented project design work, which, as Dr. Scheiner agreed, is properly considered a "direct" engineering cost. Phillips and McIntyre also testified that, although the 1983 time sheets of all engineering department personnel including support staff were assembled and scanned for claim preparation purposes, Stock determined on the basis of subtasks which entries reflected direct engineering hours and used only those hours in calculating engineering costs. Thus, both the hourly engineering rate and the way it was applied were shown to be reasonable. The district court did not err in accepting the rate or its application to the number of hours attributed by Stock to the TVA contract.

b.

■ Second, TVA asserts that the district court erroneously allowed $100,000 for shop preparation costs, out of the total $338,573 awarded for prefabrication costs, solely on the basis of "oral estimates" of Stock witnesses. In its brief, TVA argues that, in government contract termination cases, "mere undocumented estimates offered by company management, even those supported by testimony of public accountants, are generally not considered to be 'credible evidence' of costs." (Citing *Wilner Constr. Co.*, 79–2 B.C.A. (CCH) ¶ 14,180, at 69,779, 1979 WL 2692 (VACAB 1979); *Clary Corp.*, 74–2 B.C.A. (CCH) ¶ 10,947, at 52,102–03, 1974 WL 1943 (ASBCA 1974); *Delaware Tool & Die Works, Inc.*, 71–1 B.C.A. (CCH) ¶ 8860, at 41,181, 41,183, 1971 WL 1427 (ASBCA 1971).) The estimates presented in the case before us, however, although delivered orally, were sufficiently substantiated to comport with the authorities cited by TVA and to support the district court's finding that Stock incurred a cost of $100,-000 for shop preparation costs during the prefabrication stage.

We note first that the cited authorities do not in fact support TVA's broad contention that documentary evidence is required to substantiate a claim for costs. The Board of Contract Appeals denied such a claim in *Delaware Tool* because, as the Board explained when denying the contractor's motion for reconsideration, "the appeal record [did] not show any substantiation of most of appellant's claim by engineering or production *estimates made by qualified personnel having knowledge of the pertinent facts.*" *Delaware Tool & Die Works*, 72–1 B.C.A. (CCH) ¶ 9206, at 42,708–09 (ASBCA 1971) (emphasis added). *See Wilner Constr. Co.*, 79–2 B.C.A. ¶ 14,180, at 69,779 ("The rule is well established that where entitlement is shown, but proof is not so positive as to permit an absolute determination of the precise costs, an approximate and reasonable determination may be made on the basis of the facts and circumstances and the best available evidence."); *Clary Corp.*, 74–2 B.C.A. ¶ 10,947, at 52,102–03 (costs of performance not shown on accounting records may be estimated if basis and accuracy of estimates are shown).

In the current case, two Stock witnesses who were directly involved in preparing the

claim explained how they arrived at the $100,000 figure. John Homer, Chief Engineer, outlined some of the sophisticated tasks involved in the preparatory stages of a nuclear project and estimated that the number of man hours exceeded one year's worth. William Phillips also testified about the types of tasks and hours involved; additionally, Phillips testified that he discussed the elements of the claim with the Quality Assurance Manager, members of the Quality Assurance staff, and shop production coordinators before reaching the $100,000 estimate. A third witness, Ronald McIntyre, Stock's Vice President of Finance, testified that, based on the elements of shop preparation costs identified by Homer and Phillips, $100,000 was a reasonable estimate. Finally, Paul Carren, the certified public accountant hired to conduct an independent review of Stock's termination claim, testified that shop preparation costs exemplified "a situation where it just simply is not possible to have contemporaneous records or precise accounting records[,] ... and it's an area in which a cost estimate is necessary." In Carren's opinion, "the hundred thousand dollar figure [was] not something that [was] simply pulled out of the air ... but [was based on] testimony from Stock professionals as to the types of activities they felt applied to this area and [an] estimate of approximately how many hours were involved." In light of the testimony, particularly that of the two individuals (Homer and Phillips) with personal knowledge of facts relating to the claim, we hold that the district court's allowance of $100,000 in shop preparation costs was not clearly erroneous.

c.

■ Third, TVA protests the district court's award of the full $94,609 claimed by Stock as employee severance costs. TVA asserts that Stock would have laid off the "severed" employees regardless of the fate of the TVA project and, alternatively, that certain severance costs were improperly allowed.

Stock presented testimony and documentary evidence in the form of time cards and termination sheets to show that, of the one hundred and thirty-one employees terminated during the relevant period, eighty-one terminations were attributable to the loss of the TVA project. The $94,609 claimed by Stock and awarded by the district court was calculated on the basis of eighty-one terminations. The district court thus implicitly found that eighty-one persons left Stock's employ due to the termination of the TVA contract, and there is sufficient evidence in the record to support that finding.

■ The total severance claim was comprised of three categories: lump-sum severance payments, medical costs, and vacation costs. TVA argues that the lump-sum severance payments were improperly allowed because Stock introduced no evidence at trial to show that such payments were company policy; according to TVA, the payments were "purely gratuitous" and thus did not constitute foreseeable claims arising out of the termination. Stock, however, did present the testimony of William Phillips, who stated that Stock's policy was to grant severance payments. TVA also asserts that medical and vacation costs were accrued costs, already included in the hourly rate as overhead, and that to allow a separate claim for them results in multiple recovery. Paul Carren was asked at trial whether it would make any difference if Stock had accrued any part of severance costs on its books before the employee was terminated. He responded:

[A]ccrual accounting is a bit of a tricky area. Accruals can be adjusted at any particular time. They are—all accrual is an estimate of a cost or a liability or an amount that a company anticipates it may or may not pay at a later date.

I think the fact of the matter is that we're dealing with a number of people that were terminated. Those particular terminations have been attributed to the termination of the TVA contract. We are dealing with ... termination costs during a particular period, and, again, we're dealing with an attempt to assign those costs to the TVA contract on some reasonable basis and I believe this is it.

Thus there is support for the district court's finding that Stock had properly charged medical and vacation costs against TVA as a separate claim "accrued and incurred as a direct result of the cancellation of the contract."

d.

Finally, TVA challenges the award of $166,576 as additional costs incurred in settlement of the termination claim. First, TVA notes that the district court stated two different findings on settlement costs, one in the amount of $71,967 and one in the amount of $166,576. It is clear, however, that despite the apparently inadvertent entry of $71,967 as settlement costs in the court's explanation of how it arrived at the total award, the district court made specific factual findings that Stock had incurred in-house claim preparation costs of $38,880, related travel expenses of $1,549, and outside claim preparation costs (legal fees) of $126,147, for a subtotal of $166,576 in settlement costs.[13] Furthermore, it is this amount, when entered into the calculation of the total award, that yields the sum of $2,317,409 (after credit for progress payments and before interest) awarded to Stock. We therefore accept the figure of $166,576 as the district court's true finding with respect to settlement costs.

Second, TVA argues that Stock's legal fees are not recoverable since the contract did not provide for them. TVA takes particular aim at legal costs incurred after the contracting officer's denial of Stock's termination claim in September 1985.

Although the contract did not provide for legal fees as such, the termination for convenience provision allowed "reasonable administrative costs incurred in the settlement of the contract." The district court found that, in addition to its in-house and travel expenses, Stock incurred outside claim preparation costs (legal fees) of $126,147; the court expressly stated that "such amount was a reasonable *administrative* cost incurred in *settlement* of the contract." (Emphasis added.) There is support in the law for the district court's characterization of legal fees incurred in

settlement—in contrast to those incurred in litigation—as a reasonable administrative cost, even though some of those fees were for work done after the contracting officer denied Stock's claim. *See, e.g., Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298, 1305–06 (1976) (legal fees allowable to extent reasonably necessary for claim settlement preparation and presentation; "[i]n determining the allowability of a contractor's claim for attorney's fees, it is the nature and form of the legal activities, rather than the time when costs for the legal services were incurred, which provide the proper focus of inquiry"), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977). And there is support in the record for the district court's finding that Stock paid $126,147 in legal fees in connection with claim settlement, i.e., not in connection with litigation. *See* Letter from Peat Marwick Main & Co. to Stock (Sept. 15, 1987) (entered into evidence as Plaintiff's Exhibit 62); Record, vol. 11, at 45–47, 96–105 (testimony of Paul Carren). Thus we find no error in the district court's award of $126,147 in legal fees.

III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

**13.** TVA does not specifically challenge the awards for in-house claim preparation or for travel expenses. Its challenge to the award of legal fees is discussed in the text, *infra.*