64 F.3d 678
 40 Cont.Cas.Fed. (CCH) P 76,835
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
INTERNATIONAL GUNNERY RANGE SERVICES, INC., Appellant,
v.
Sheila E. WIDNALL, Secretary of the Air Force, Appellee.
 No. 94-1444.
 United States Court of Appeals, Federal Circuit.
 Aug. 24, 1995.
 
 Before PLAGER, Circuit Judge, COWEN, Senior Circuit Judge, and LOURIE, Circuit Judge.
 COWEN, Senior Circuit Judge.
 
 
 1
 International Gunnery Range Services, Inc. (IGRS) appeals the decisions of the Armed Services Board of Contract Appeals (Board) in International Gunnery Range Serv., Inc. v. United States, 94-3 BCA (CCH) p 27,002 (June 23, 1994), and International Gunnery Range Serv., Inc. v. United States, 90-1 BCA (CCH) p 22,601 (Dec. 28, 1989). We vacate both Board decisions and remand the case to the Board for further proceedings in accordance with this decision.
 
 BACKGROUND[1]
 
 2
 On January 18, 1981 the United States, acting through the Department of the Air Force at the Luke Air Force Base, Arizona, awarded Arizona Excavating a contract in the total amount of $1,908,425.00. The contract was subsequently novated to IGRS, Arizona Excavator's successor-in-interest. The contract was for the maintenance of the Gila Bend Gunnery Range at the Luke Air Force Base. The parties agreed that the Government would furnish IGRS with trucks to be used as targets in Air Force bombing and strafing exercises. IGRS placed the vehicles on the target range and removed them after a stipulated period. After the vehicles were removed from the range, IGRS was permitted to sell them or otherwise salvage them.
 
 
 3
 During the performance of the work, the Air Force issued several orders and contract modifications, which resulted in IGRS's assertion of nine separate claims for upward adjustment of the contract price in the total sum of $857,364.17.
 
 
 4
 Following completion of the contract performance on December 31, 1982, Dennis Marketic, President of IGRS met with the contracting officer, Msgt. Robert Thompson, and negotiated an agreement to settle all of IGRS's claims in exchange for 245 government trucks. The contracting officer determined that he did not have the authority to transfer government owned-property. Therefore, he submitted the proposed settlement to the Air Force Contract Adjustment Board (AFCAB) for approval under public law 85-804, 50 U.S.C. Secs. 1431-1435 (1976).
 
 
 5
 On April 2, 1985, the AFCAB approved the proposed settlement and directed the parties to enter into a contract modification containing the terms of the settlement as set forth in the order of the AFCAB.
 
 
 6
 On May 12, 1985, the parties formally executed Modification P00031, (hereinafter modification), incorporating the agreement as directed by the ASCAB. The modification provided in pertinent part as follows:
 
 
 7
 1. The parties agree that in full settlement of all claims the government will:
 
 
 8
 a. Transfer title to IGRS to 245 salvage trucks obtained through DPDO [the Defense Property Disposal Office]. These trucks will be selected by agreement of the contracting officer and IGRS and they will be in a similar condition to those trucks that would have been generated under the contract. These trucks will be an approximate mixture of 75% five ton trucks and 25% 2 1/2 ton trucks. The Government will, within 20 days of the execution of this agreement, submit requisitions for these trucks through appropriate channels. These trucks will be made available to IGRS at either Luke AFB or DPDO at Tucson, AZ. The contracting officer will furnish evidence of the transfer of title sufficient to IGRS to register the vehicles. These trucks will be made available within a [sic] 180 days of this agreement.
 
 
 9
 b. Return title to IGRS to all salvage presently in place at IGRS's facility at Gila Bend, AZ.
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 2. This contract modification constitutes a full discharge, accord and satisfaction, and release of any and all claims, demands, or causes of action, actual or constructive, legal, equitable, contractual or administrative, known or unknown, which IGRS and the Government have against the other, arising out of contract F02604-81-D0007, including, but not limited to, all claims relating to salvage described in this agreement, the absence of salvage, or the storage of salvage.
 
 
 13
 The contract also required IGRS to waive all of its claims for interest and attorney fees.
 
 
 14
 Following the execution of the modification, Msgt. Thompson and Mr. Marketic met in an attempt to agree upon the trucks that would be provided IGRS in accordance with the modification.
 
 
 15
 Mr. Marketic gave Msgt. Thompson a copy of the government manual containing condition codes that represented the classification of the condition of surplus vehicles by the Defense Reutilization and Marketing Service. After discussion, the parties agreed that trucks meeting the conditions described in the supply codes F and G, and disposal codes 4, 5, and 7 would be provided to IGRS. At that time, Msgt. Thompson was not very familiar with the condition codes and relied primarily on disposal codes 4, 5, and 7. Disposal code 4 is defined as "used property that would be usable without repairs." Disposal code 5 is defined as "property that would be usable without repairs, but is somewhat worn and deteriorated and may soon require repairs." Disposal code 7 is defined as "goods that require minor repairs not exceeding 15% of the original acquisition cost." He believed that the codes meant that the trucks would be in a repairable condition. He based that belief on his inspection of 16 or 18 trucks in the contractor's receiving yard.
 
 
 16
 Because of Msgt. Thompson's lack of familiarity with the codes, there was not a mutual understanding by the parties that the trucks to be provided IGRS in accordance with the modification would be in the condition described in supply codes F and G, and disposal codes 4, 5, and 7. However, both parties agreed that and understood that the trucks would be in the condition in which they were received at the base and before they were used for target practice. Mr. Marketic testified that if the Air Force had offered him trucks that had been used for target practice, he would have rejected them.
 
 
 17
 The contracting officer never anticipated that after the trucks were received at the base, they would be subjected to target practice and then transferred to IGRS. Instead, he anticipated that the 245 trucks to be provided by DPDO would be delivered to the contractor when received and if IGRS accepted them, that would complete the settlement between the parties.
 
 
 18
 On May 9, 1988, during his testimony at the first Board hearing, which was about three years after he and Mr. Marketic made the settlement agreement, Msgt. Thompson was asked to state his interpretation of the contract term: "trucks similar to those that would have been generated under the contract." He replied that his interpretation at the time of the hearing was that the contract term meant trucks that had been used for target practice. However, he stated that that was not his interpretation at the time of the settlement, when he understood and agreed that the trucks to be supplied from the Government would be delivered to IGRS before they were used for target practice.
 
 
 19
 The Board found that at the time Msgt. Thompson and Mr. Marketic entered into the settlement agreement in 1985, Msgt. Thompson believed that the modification language: "as would have been generated under the contract" referred to vehicles which had been used for target practice. That finding is contrary to the testimony of Marketic and Thompson and is not supported by substantial evidence.
 
 
 20
 On August 31, 1985, prior to the transfer of title to IGRS of the 245 trucks, Msgt. Thompson retired and was replaced by Captain Sharon Dunbar as contracting officer. She was informed by the Defense Reutilization and Marketing Service[2], from which the trucks were to be obtained, that the trucks were not available.
 
 
 21
 On May 21, 1986, three-and-a-half years after the contract work had been fully performed, Captain Dunbar issued a contract modification, terminating the contract for the convenience of the Government "due to the non-availability of the required 245 salvage trucks." IGRS then submitted a proposed termination settlement claim, seeking $8,589,028.00--over ten times the amount of IGRS original claim-for the value of the 245 trucks.
 
 
 22
 On September 3, 1986, the parties agreed to meet at Camp Pendleton and select trucks that would be similar to those that would "have been generated" under the contract. John Smith, an independent expert, was retained to evaluate the trucks. After his calculations were made to determine the value of the trucks, the Air Force was to pay IGRS the amount equal to the calculation. However, the parties were unable to agree on the specific trucks that would meet the requirements of their proposal for determining the value of the trucks. Consequently, they failed to reach a settlement on the basis of using Mr. Smith to value the trucks.
 
 
 23
 On December 19, 1986, Captain Dunbar issued a decision that $1,255,625.00 represented "the fair and reasonable compensation for the 245 salvage trucks provided for in the modification." IGRS was then paid the $1,255,625.00, and on January 8, 1987 filed an appeal.
 
 
 24
 While the case was pending before the ASBCA, the parties engaged in discovery and as a result of information thus obtained, Captain Dunbar determined that the value of the 245 trucks was $93,355.00. The determination was based on her conclusion that, under the terms of the contract, IGRS was entitled only to the value of the trucks after they had been used for target practice and her finding that after the trucks came off the target range, most of them had only a scrap value.
 
 
 25
 On December 28, 1989, the ASBCA issued its decision, International Gunnery Range Serv., Inc., 90-1 BCA p 22601. The ASBCA rejected the positions taken by both parties, and on its own initiative and without any request by the Government, concluded that the parties had entered into the modification under the mistaken belief that there were trucks available to carry out the terms of the settlement agreement. Accordingly, the ASBCA rescinded the modification and remanded the matter to the parties for litigation on the merits.
 
 
 26
 The Board noted that the appeal was technically an appeal from the contracting officer's determination of the costs to which IGRS was entitled as a result of contracting officer's order of May 1, 1986, terminating the contract for the convenience of the Government. Citing Maxima Corp. v. United States, 847 F.2d 1549 (Fed.Cir.1988), the Board held the termination order was a nullity, because it was issued long after contract performance had ended.
 
 
 27
 IGRS appealed the ASBCA's decision to this court, which in an unpublished decision, dismissed the appeal on the ground that the decision was not final. International Gunnery Range Serv., Inc. v. United States, 918 F.2d 186 (Fed.Cir.1990) (Table).
 
 
 28
 Following the court's decision, the contracting officer issued her decision in which she determined that IGRS was entitled to additional amounts on each of its claims. She further found, however, that as a result of alleged work reductions and decreases in the cost of residue and material removal, the Government was entitled to a payment from IGRS in the amount which exceeded that due IGRS by $165,748.33. The contracting officer demanded payment in that amount, plus repayment of the $1,255,625.00 which had previously been paid to IGRS.
 
 
 29
 IGRS again appealed the contracting officer's decision to the ASBCA. The parties then elected to litigate the merits of the individual claims on the written record; they also agreed that the decision of the ASBCA would include both entitlement and quantum determinations.
 
 
 30
 In its first decision, the Board instructed the parties that in their settlement negotiations, the value of salvage opportunities lost by IGRS should be based on the value of the trucks that IGRS would have received after use of the trucks as targets. Pursuant to that instruction, the Board, at the hearing on the amount due IGRS, ruled that the issue of the condition of the trucks that would have been delivered to IGRS had been litigated in its first decision and that no further evidence would be received on that issue.
 
 
 31
 On June 27, 1994, the ASBCA issued its opinion in International Gunnery Range Serv., Inc. v. United States, 94-3 BCA (CCH) p 27,002. The ASBCA concluded that although IGRS was entitled to contract adjustments because of lost salvage opportunities, the deletion of work associated with those salvage opportunities entitled the Government to equitable adjustments. The net of these two entitlements, as decided by the ASBCA, left IGRS owing the Government $1,304,849.60 plus interest. Accordingly, the ASBCA entered judgment for that amount in the Government's favor. IGRS's timely appeal to this court followed.
 
 DISCUSSION
 I.
 The Standard of Review
 
 32
 The Contract Disputes Act of 1978 (CDA) states the standard for this court's review of decisions from agency contract appeals boards as follows:
 
 
 33
 [T]he decision of the agency board on any question of law shall not be final or conclusive, but the decision of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.
 
 
 34
 41 U.S.C. Sec. 609(b) (1988); see Federal Data Corp. v. United States, 911 F.2d 699, 702 (Fed.Cir.1990).
 
 II.
 The Jurisdictional Issue
 
 35
 IGRS has raised a jurisdictional issue by its contention that the ASBCA lacked jurisdiction to rescind the modification, which had been authorized and prescribed by the AFCAB pursuant to P.L. 85-804, as amended, 50 U.S.C. Secs. 1431-1435 (1976).
 
 
 36
 P.L. 85-804 provides that the President may authorize any department or agency of the Government, which exercises functions in connection with the national defense, to enter into contracts without regard to other provisions of the law whenever he deems that such action would facilitate the national defense. The statute also provides that the authority to enter into such contracts shall not be utilized in excess of $50,000.00 without approval by a contract adjustment board.
 
 
 37
 The regulation promulgated pursuant to P.L. 85-804 is entitled "Contract Adjustment Boards" and provides as follows:
 
 
 38
 An agency head may establish a contract adjustment board with authority to approve, authorize, and direct appropriate action under this part 50 and to make all appropriate determinations and findings. The decisions of the board shall not be subject to appeal; however, the board may reconsider and modify, correct, or reverse its previous decisions. The board shall determine its own procedures and have authority to take all action necessary or appropriate to conduct its functions.
 
 
 39
 48 C.F.R. Sec. 50.201 (1994).
 
 
 40
 In construing P.L. 85-804 and its implementing regulation, this court held that the decisions of contract adjustment boards are final and not subject to review, either by an agency board of contract appeals or by a court. Murdock Machinery & Engineering Co. of Utah v. United States, 873 F.2d 1410, 1413 n. 1 (Fed.Cir.1989); Coastal Corp. v. United States, 713 F.2d 728, 731 (Fed.Cir.1983).
 
 
 41
 In attempting to show that it was not exceeding its authority to review the decision of the AFCAB the Board declared:
 
 
 42
 Our [previous] decision ... in no way modified, amended or rescinded the AFCAB's grant of extraordinary authority to the contracting officer. Rather, we concluded that Modification P00031, in implementing the grant of authority, failed because the parties mistakenly believed that the vehicles required to be transferred to effectuate the settlement were available. Without the vehicles, which were worth more to appellant than to the Government, there simply was no agreement, regardless of the grant of authority under P.L. 85-804.
 
 
 43
 In Murdock, the Navy Contract Adjustment Board (NCAB) granted the contractor P.L. 85-804 relief by converting his fixed-price contract into a cost reimbursement/no-fee contract and notified the parties that they should comply with the decision. The Navy located another source of supply for the equipment that was to be produced by Murdock. The Navy then notified Murdock and the NCAB that it was withdrawing its recommendations for P.L. 85-804 relief. Thereafter the contracting officer terminated Murdock's contract for default because of Murdock's financial inability to perform the contract and its anticipatory breach. Murdock appealed to the ASBCA which denied his appeal.
 
 
 44
 On review, we held that the ASBCA erred, and that the NCAB decision was final and converted the fixed-price contract into a cost reimbursement/no-fee contract that obligated the Government to pay Murdock its cost in performing the contract.
 
 
 45
 In Murdock we also decided that neither P.L. 85-804 nor its implementing regulation gives a contracting officer the right to repudiate the terms of a final decision of a contract adjustment board, and that the authority to reconsider, modify, or reverse its decisions resides in the contract adjustment board alone.
 
 
 46
 The Board in this case asserted that it was in no way modifying, amending, or rescinding the AFCAB's grant of "extraordinary authority to the contracting officer." In fact, however, the decision of the AFCAB was a grant of extraordinary contractual relief to IGRS in the form of a modification which was incorporated in full in the decision of the AFCAB and was therefore an integral part of that decision. In rescinding the modification, the ASBCA repudiated the decision of the AFCAB as surely and as completely as the contracting officer repudiated the decision of the NCAB in Murdock. On the authority of that decision and the regulation implementing P.L. 85-804, we hold that the ASBCA had no authority to rescind the modification. Consequently, we vacate both Board decisions.
 
 III.
 
 47
 The Government's Breach of Contract and the Measure of Damages
 
 
 48
 As a result of our decision vacating both Board decisions, we must now determine the respective rifhts and obligations of the parties under the modification as it was written. Because of the Government's breach of contract in failing to deliver the 245 trucks, IGRS is entitled to recover the fair market value of the trucks. IGRS is also entitled to recover the market value of the material stock piled at the contractor's facility at Gila Bend, Arizona. (See J.A. 117) All other claims or causes of actions which IGRS and the Government had against the other arising out of the modification were released and discharged by the terms of the modification.
 
 
 49
 The crucial issue to be resolved in fixing the measure of damages is the correct construction of that part of the modification which stated that the trucks to be transferred to IGRS "will be in a condition similar to those trucks that would have been generated under the contract." The Board's decision on this issue involves a question of law which we review de novo. We find persuasive evidence of the meaning of this language in a memorandum of April 2, 1985, that the chairman of the AFCAB sent to the commanding officer of Luke Air Force Base. The memorandum states that the request for extraordinary contractual relief under P.L. 85-804 had been granted, and further stated as follows:
 
 
 50
 The current contracting officer at Luke AFB, Master Sergeant Robert L. Thompson, shall modify the contract in question by executing the contractual modification which is attached to this memorandum (Atch 1). The contracting officer shall also ensure that such contractual modification is executed by Mr. Dennis Marketic, president of IGRS. After such modification has been signed, the appropriate officials at Luke AFB will formally request 245 vehicles from the local DPDO. DPDO has agreed to satisfy this request. The vehicles will then be turned over to the Air Force through the DPDO system and the Air Force contracting officer will then, based upon the authority of this ratification by the Board, settle the contract claims and transfer the trucks and the material at the Contractor's facility at Gila Bend, Arizona to IGRS.
 
 
 51
 The plain import of the language of the memorandum is that when the DPDO delivered the trucks to the Luke Air Force Base, the contracting officer would transfer the trucks to IGRS at that time rather than after the trucks were used for target practice.
 
 
 52
 Our construction of the language of the modification is buttressed by the agreement made between Msgt. Thompson and Mr. Marketic in 1985, soon after the modification was signed. Pursuant to the terms of the modification, they met to select the trucks which they believed would comply with the modification. Both parties clearly understood and agreed that after the trucks were requisitioned from the DPDO and delivered to Luke Air Force Base, the contracting officer would transfer them at that time rather than after the trucks had been used for target practice. Their agreement was made before a dispute between the parties arose when Captain Dunbar terminated the modification after she was informed that the trucks were not available.
 
 
 53
 In Max Drill, Inc. v. United States, 427 F.2d 1233 (Ct.Cl.1970), the court observed:
 
 
 54
 The interpretation of a contract by the parties to it, before the contract becomes the subject of controversy, is deemed by the courts to be of great, if not controlling weight.
 
 
 55
 See also Alvin, Ltd. v. United States, 816 F.2d 1562, 1566 (Fed.Cir.1987); Macke Co. v. United States, 467 F.2d 1323, 1325 (Ct.Cl.1972); Forsberg & Gregory, ASBCA Nos. 17672 & 18069, 75-1 BCA (CCH) p 11,177. In light of the facts and the authorities cited, we conclude that the agreement made by Msgt. Thompson and Mr. Marketic in 1985, constitutes a correct construction of the terms of the modification, and that IGRS is entitled to the market value of the 245 trucks on the basis of the condition of the trucks at the time they would have been received at the base by the contracting officer and before the trucks were used for target practice. In ruling otherwise, the ASBCA erred as a matter of law.
 
 IV.
 Conclusion
 
 56
 For the reasons stated above, both decisions of the Board are vacated and the case is remanded to the Board for a determination, in accordance with this decision, of the amount due IGRS because of the Government's breach of contract, or the net amount due the Government if the Board finds that the amount due IGRS is less than the $1,255,625.00 that the Government previously paid IGRS in settlement of its termination claim.
 
 
 57
 VACATED AND REMANDED.
 
 
 
 [1]
 The facts set forth in this opinion consist of findings made by the Board, facts which both parties have agreed upon, or facts which the court has found based upon undisputed evidence. See Ordnance Research, Inc. v. United States, 609 F.2d 462, 465 (Ct.Cl.1979); Koppers Co. v. United States, 405 F.2d 554, 559 (Ct.Cl.1968)
 
 
 [2]
 Formerly known as the Defense Property Disposal Office (DPDO), the agency referred to in the modification